

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2005

# McGowan v. NJR Ser Corp

Precedential or Non-Precedential: Precedential

Docket No. 04-3620

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"McGowan v. NJR Ser Corp" (2005). *2005 Decisions.* Paper 478.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/478

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 04-3620
_____

JAMES M. MCGOWAN, SR.,

<u>Appellant</u>

v.

NJR SERVICE CORPORATION;
NEW JERSEY NATURAL GAS COMPANY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 03-cv-01035)
District Judge: The Honorable Stanley R. Chesler

_____

Argued June 8, 2005

BEFORE: FUENTES, VAN ANTWERPEN and BECKER,
<u>Circuit Judges</u>

(Filed September 13, 2005)

Samuel J. Halpern (Argued)
443 Northfield Avenue
West Orange, NJ 07052

*Counsel for Appellant*

Richard C. Mariani (Argued)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
10 Madison Avenue, Suite 402
Morristown, NJ 07960

*Counsel for Appellee New Jersey Natural Gas Company*

---

OPINION

---

VAN ANTWERPEN, Circuit Judge

Appellant James M. McGowan, Sr., was employed by Appellee New Jersey Natural Gas Company ("NJNG") for more than 27 years. He participated in NJNG's Plan for Retirement Allowances for Non-represented Employees ("the Plan") and initially designated his second wife, Rosemary, the "joint and survivor contingent beneficiary." On March 5, 2003, McGowan filed an action in the United States District Court for the District of New Jersey, seeking declaratory relief directing NJNG and the Plan to recognize: (1) Rosemary's purported waiver of her rights as beneficiary; and

2

(2) McGowan's subsequent nomination of his present wife, Donna, as the new beneficiary.

Whether the administrators of a retirement plan that is covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., are required to recognize an individual's waiver of her beneficiary interest under the plan is an issue of first impression in this Circuit, and there is a split among the courts of appeals that have considered the issue. The District Court below denied McGowan's motion for summary judgment and granted summary judgment in favor of NJNG. The court held that Plan administrators are not required to look beyond Plan documents to determine whether a waiver has been effectuated in a private agreement between the participant and his named beneficiary. For the reasons set forth below, we will affirm.[1]

## I. FACTUAL AND PROCEDURAL HISTORY

McGowan was employed by NJNG from May 12, 1969, until his retirement on November 30, 1996. As of the date of his retirement, McGowan was married to his second wife, Rosemary Byrne. Shortly before his retirement, McGowan elected to receive his retirement benefits in the

---

[1] Although this Opinion represents the Opinion of the Court in affirming the lower court's decision, Judge Becker has declined to join in the reasoning contained in Part III.A.1, infra. See Concurring Op. at 22.

form of an "automatic surviving spouse option," creating a 50% survivor annuity for Rosemary. This election remained in effect when he began receiving benefits in 1996.

McGowan and Rosemary were divorced in Palm Beach County, Florida, on May 24, 1999. On July 23, 1998, prior to the formal entry of the divorce, they entered into a Marital Settlement Agreement, which was later incorporated into the final judgment of dissolution. The agreement stated that Rosemary "waives any and all rights, title, interest or claims . . . to all bank accounts, life insurance policies and any right to the New Jersey Gas Company Employee Pension Plan of the Husband." (App. at A61.) Shortly after Rosemary signed this purported waiver, McGowan contacted the Plan to change the named survivor beneficiary. On July 27, 1998, Rosemary signed a form consenting to the election of McGowan's first wife, Shirley McGowan, as the replacement beneficiary.

In an August 6, 1998, letter, the Plan's benefits manager, Nancy Renner, informed McGowan that the Plan did not permit changes to his prior contingent beneficiary election once he started receiving benefit payments. Notwithstanding the Plan's denial of his initial request, McGowan sought to change beneficiaries again after his marriage to his current wife, Donna McGowan, on November 3, 2001. NJNG refused to recognize McGowan's nomination of Donna as the new contingent beneficiary and maintained that Rosemary was still the beneficiary under the Plan.

On February 25, 2002, McGowan filed an appeal with the Plan, which was denied by the Plan Claims

4

Administration Committee on April 30, 2002.  McGowan subsequently exhausted all administrative appeals and commenced the present action with a two-count Complaint in the United States District Court for the District of New Jersey on March 5, 2003.  In Count I, McGowan sought a declaration directing NJNG to recognize Rosemary's waiver and the subsequent nomination of Donna as the new beneficiary.  In Count II, McGowan sought the imposition of civil penalties against NJNG for allegedly failing to produce Plan documents within the time period designated by ERISA at 29 U.S.C. § 1132(c).

In its July 26, 2004, Order and Opinion, the District Court denied McGowan's Motion for Summary Judgment and granted NJNG's Cross-Motion for Summary Judgment. Appellant filed a timely Notice of Appeal with this Court on August 23, 2004.

## II.  JURISDICTION AND STANDARDS OF REVIEW

NJNG's retirement plan is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1).  The District Court thus had federal question jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1331.  See also 29 U.S.C. § 1132(a)(1)(B) (a plan participant has the right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under terms of the plan").  Pursuant to 28 U.S.C. § 1291, this Court has appellate jurisdiction over the District Court's final

5

order ruling on the parties' cross-motions for summary judgment.

"The standard of review in an appeal from an order resolving cross-motions for summary judgment is plenary." Cantor v. Perelman, __ F.3d __, 2005 WL 1620323, *3 n.2 (3d Cir. July 12, 2005) (citing Int'l Union, United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir. 1990)). In reviewing the propriety of a summary judgment ruling, we apply the same standard that the District Court should have applied. Bucks County Dep't of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 65 (3d Cir. 2004). Under Fed. R. Civ. P. 56(c), summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The material facts of this case are not in dispute, and the issue presented is purely legal: whether NJNG should be compelled to recognize Rosemary's waiver of her rights as a beneficiary under the Plan.

With respect to McGowan's claim that NJNG failed to provide Plan documents in a timely manner, we review the District Court's denial of civil penalties under 29 U.S.C. § 1132(c) for abuse of discretion. See Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 153 (3d Cir. 1987), rev'd in part on other grounds, 489 U.S. 101 (1989).

## III. DISCUSSION

### A. *Waiver of Benefits Under ERISA*

As noted, there is a circuit split on the issue of whether administrators of an ERISA plan are required to recognize a beneficiary's waiver of his or her benefits. The majority of circuits that have addressed this issue have held that such waivers are valid under certain circumstances. See, e.g., Altobelli v. Int'l Bus. Mach. Corp., 77 F.3d 78 (4th Cir. 1996); Mohamed v. Kerr, 53 F.3d 911 (8th Cir. 1995); Brandon v. Travelers Ins. Co., 18 F.3d 1321 (5th Cir. 1994); Metro. Life Ins. Co. v. Hanslip, 939 F.2d 904 (10th Cir. 1991); Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275 (7th Cir. 1990) (en banc). Only two courts of appeals have disagreed, holding that plan administrators need not look beyond the documents on file with the plan to determine whether there has been a valid waiver effectuated in outside private documents. Krishna v. Colgate Palmolive Co., 7 F.3d 11 (2d Cir. 1993); McMillan v. Parrott, 913 F.2d 310 (6th Cir. 1990).[2]

---

[2] Although this is an issue of first impression in this Court, the District Court's decision in this case is the fourth time that a district court within this Circuit has addressed waivers under ERISA. Including decision below, two district court decisions in this Circuit have sided with the minority view, see also Zienowicz v. Metro. Life. Ins. Co., 205 F. Supp. 2d 339 (D.N.J. 2002), and two others have applied the majority approach, John Hancock Mut. Life Ins. Co. v. Timbo, 67 F. Supp. 2d 413

"ERISA is an intricate, comprehensive statute." Boggs v. Boggs, 520 U.S. 833, 841 (1997). It is so designed in order to protect "the interests of participants in employee benefit plans and their beneficiaries[.]" 29 U.S.C. § 1001(b); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). The majority approach is largely based on the premise that, despite the comprehensive nature of the statute, there are "gaps" that may be filled by reliance on federal common law. See, e.g., Altobelli, 77 F.3d at 80; Brandon, 18 F.3d at 1325; Fox Valley, 897 F.2d at 278; Lyman Lumber Co. v. Hill, 877 F.2d 692, 693 (8th Cir. 1989); see also Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 n.8 (3d Cir. 1993) ("Firestone authorizes the federal courts to develop federal common law to fill gaps left by ERISA." (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989))).

According to the majority approach, because ERISA does not explicitly address "waiver" by a beneficiary, we may turn to federal common law to determine whether, and under what circumstances, an individual may validly waive her benefits in an ERISA plan. See Altobelli, 77 F.3d at 81; Brandon, 18 F.3d at 1326; Fox Valley, 897 F.2d at 281; Lyman Lumber, 877 F.2d at 693. Under the federal common law that has developed, an individual's waiver is valid if, "upon reading the language in the divorce decree, a reasonable person would have understood that she was waiving her beneficiary interest. . . ." Clift v. Clift, 210 F.3d

_____

(D.N.J. 1999); Trustees of Iron Workers Local 451 Annuity Fund v. O'Brien, 937 F. Supp. 346 (D. De. 1996).

8

268, 271-72 (5th Cir. 2000); see also Mohamed, 53 F.3d at 914-15 ("a property settlement agreement entered into pursuant to a dissolution may divest former spouses of beneficiary rights in each other's [ERISA benefits], if the agreement makes it clear that the former spouses so intend."). Moreover, "any waiver must be voluntarily made in good faith." Clift, 210 F.3d at 272.

We disagree with McGowan's argument that the situation presented by this case is not resolved by looking to the express terms of ERISA, and we therefore decline to follow the federal common law approach.

1.    ERISA's Requirement that Plans Be Administered in Accordance with the Plan Documents

ERISA imposes a fiduciary duty on plan administrators to discharge their duties "in accordance with the documents and instruments governing the plan. . . ." 29 U.S.C. § 1104(a)(1)(D). As such, the statute dictates that it is the documents on file with the Plan, and not outside private agreements between beneficiaries and participants, that determine the rights of the parties. McMillan, 913 F.2d at 311-12 ("This clear statutory command, together with the plan provisions, answer the question; the documents control. . . ."); cf. Egelhoff v. Egelhoff, 532 U.S. 141, 150 (2001) (noting "ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents.").

The Plan documents in this case designate Rosemary as the beneficiary, and any requirement imposed on Plan administrators to look beyond these documents would go against the specific command of § 1104(a)(1)(D). Because this case is resolved by reference to the terms of ERISA and the Plan documents alone, federal common law should simply have no place in our analysis.

Our holding is not only required by the terms of § 1104(a)(1)(D), but it is also necessary to promote one of the principal goals underlying ERISA – ensuring that "plans be uniform in their interpretation and simple in their application." McMillan, 913 F.2d at 312 (citing H.R. Rep. No. 93-533 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4650); see also Krishna, 7 F.3d at 16 (noting the "strong interest in uniform, uncomplicated administration of ERISA plans."). This extremely important policy goal is best served by the conclusion that, under § 1104(a)(1)(D), outside waivers are not binding on Plan administrators. Cf. Fox Valley, 897 F.2d at 284 (Ripple, J., dissenting) (noting that § 1104(a)(1)(D) "embodies a strong federal policy that all parties – participant, trustee, and beneficiary – be able to ascertain their rights and liabilities with certainty."). As Judge Wilkinson stated in his dissenting opinion in Altobelli:

Strict adherence to § 1104(a)(1)(D) ensures that all interested parties, including participants, beneficiaries, and plan administrators, can identify their rights and duties with certainty, a primary objective of ERISA. This in turn limits costly disputes over the effect of outside documents on the distribution of plan benefits.

Altobelli, 77 F.3d at 82 (Wilkinson, C.J., dissenting) (internal citations omitted).

The Supreme Court similarly relied on the need for certainty and uniformity in the administration of ERISA plans when it held in Egelhoff, 532 U.S. at 148-51, that ERISA preempts a state statute whereby a former spouse's beneficiary designation was automatically revoked upon divorce. The Court also relied on "the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators. . . ." Id. at 150 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990)). The Court noted that, if ERISA did not preempt the state law at issue, a burden would be created for administrators to "familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been 'revoked' by operation of law" rather than "simply . . . identifying the beneficiary specified by the plan documents." Id. at 148-49. These same concerns counsel against requiring administrators to familiarize themselves with the various private agreements that might exist between participants and beneficiaries to determine whether they contain valid waivers under federal common law.

11

My colleagues accept McGowan's assertion that requiring Plan administrators to recognize waivers does not in fact undermine certainty or uniformity, and that it would not create any administrative burden that is not already imposed by ERISA itself. McGowan points to 29 U.S.C. § 1056(d)(3), which allows the designation of an alternate payee by obtaining a qualified domestic relations order ("QDRO").[3] Administrators are already required to review domestic relations orders, such as divorce decrees and property settlement agreements,[4] to determine whether they are

---

[3] All parties agree that the Florida state judgment of dissolution, which incorporated McGowan's Marital Settlement Agreement and Rosemary's waiver, does not qualify as a QDRO.

[4] ERISA defines a "domestic relations order" as:

[A]ny judgment, decree, or order (including approval of property settlement agreement) which —

    (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

    (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii).

12

"qualified" under the requirements set forth in 29 U.S.C. §§ 1056(d)(3)(C) & (D). Thus, McGowan claims that the enforcement of waivers would place no burden on administrators that does not already exist. Cf. Altobelli, 77 F.3d at 81; Fox Valley, 897 F.2d at 282 ("No such additional burdens will be imposed. . . . Our decision only requires plan administrators to continue their current practice of thoroughly investigating the marital status of a participant.").

I disagree. Sections 1056(d)(3)(C) & (D) provide very specific, objective elements that must be present for a domestic relations order to be "qualified." Thus, to determine if a document is a QDRO, administrators can essentially utilize a checklist and easily ascertain whether, for example, the document "specifies the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order," 29 U.S.C. § 1056(d)(3)(C)(i). Under the majority approach, on the other hand, administrators have to interpret documents that could otherwise be summarily discarded as non-QDROs, applying less concrete standards, to determine whether they were (1) voluntarily entered into, (2) in good faith, and (3) specific enough that a "reasonable person" would see them as valid waivers. It cannot be denied that requiring administrators to review contractual language under an amorphous "reasonable person" standard will create a risk of litigation and administrative burdens beyond what is created by requiring them to review orders under the uncomplicated set of objective elements set forth in § 1056(d)(3).

13

Nevertheless, McGowan argues that there is no data suggesting that plans in jurisdictions that enforce waivers have actually experienced greater administrative burdens. On the contrary, we need look no further than Eighth Circuit precedent for evidence that the majority approach creates the prospect of extensive litigation that is not created under the QDRO provision. Since that court's ruling in Lyman Lumber, it has been faced with multiple cases involving the issue of whether particular divorce settlement agreements contained sufficiently specific language to constitute valid waivers under the federal common law. See, e.g., Hill v. AT&T Corp., 125 F.3d 646, 649-50 (8th Cir. 1997); Nat'l Auto. Dealers & Assoc. Ret. Trust, 89 F.3d 496, 501 (8th Cir. 1996); Mohamed, 53 F.3d at 915. The fact that the Eighth Circuit has repeatedly re-visited this issue belies the notion that ERISA's goals of certainty, simplicity and uniformity can be achieved through the establishment of a uniform federal common law.

In sum, the express terms of ERISA, as well as the policies underlying the Act, require us to affirm the District Court. "Rules requiring payment to named beneficiaries yield simple administration, avoid double liability, and ensure that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules." Fox Valley, 897 F.2d at 283 (Easterbrook, J., dissenting). We recognize that our holding produces the somewhat strange result whereby Rosemary continues to enjoy the benefits of McGowan's survivor annuity, even after purportedly signing away her rights under the Plan. However, Congress has carefully laid out the requirements for designating (and changing)

14

beneficiaries under ERISA plans and has specifically required benefits to be paid in accordance with plan documents. As such, our holding "is a decision already made by legislation." Id. at 284.

> 2. ERISA's Prohibition on the Alienation or Assignment of Benefits

Recognition of Rosemary's waiver in this case would also contravene ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1).[5] McGowan argues that "waiver" is a distinct concept from "assignment" or "alienation" and that waiver is therefore not expressly prohibited by § 1056(d)(1). Cf. Altobelli, 77 F.3d at 81; Brandon, 18 F.3d at 1324; Fox

---

[5] Section 1056(d)(1) reads, in relevant part, "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." The Plan in this case states, in turn:

> No benefit payable under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any such action shall be void and of no effect; nor shall any such benefit be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled to such benefit, except as specifically provided in the Plan.

(App. at A133.)

<u>Valley</u>, 897 F.2d at 279. We agree as a general matter that "waiver" is not the same thing as assignment or alienation. Assignment or alienation involves an affirmative transfer of benefits to another person, whereas waiver usually involves only a refusal of benefits on the part of the individual slated to receive them. <u>Cf.</u> <u>Fox Valley</u>, 897 F.2d at 279.

That said, McGowan's argument on this point is similar to an argument rejected by the Supreme Court in <u>Boggs</u>. In that case, the Supreme Court reversed the Fifth Circuit's ruling that ERISA did not preempt a state law allowing a beneficiary to transfer her interests in her former spouse's pension plan by testamentary instrument. The court of appeals had addressed whether the testamentary transfer was prohibited by § 1056(d)(1) and attempted to distinguish that transfer from an "assignment or alienation":

> [Section 1056(d)(1)] was not intended to affect support obligations among the members of a family. Furthermore, a non-participant spouse's ownership of an interest in the participant spouse's retirement benefits involves neither an alienation nor an assignment. Under community property law, ownership vests immediately in the non-earning spouse, and no transaction is needed to convey ownership. Thus, no

> transaction prohibited by the ERISA spendthrift
> provision has occurred.

Boggs v. Boggs, 82 F.3d 90, 97 (5th Cir. 1996), rev'd, 520 U.S. 833.

The Supreme Court disagreed, stating that the testamentary transfer at issue was indeed prohibited under § 1056(d)(1), as it fell within the regulatory definition of "assignment or alienation." Boggs, 520 U.S. at 851 (quoting 26 C.F.R. § 1.401(a)-13(c)(1)(ii)). The regulation defines "assignment or alienation" as "[a]ny direct *or indirect* arrangement . . . whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary." 26 C.F.R. § 1.401(a)-13(c)(1)(ii) (emphasis added). Boggs thus demonstrates that actions which may be semantically distinguishable from "assignment or alienation" may nevertheless be prohibited by § 1056(d)(1).

Similarly, although the common definitions of "waiver" and "assignment" may diverge, McGowan seeks to use the concept of waiver in order to effectuate what is the functional equivalent of an assignment of benefits from his former wife to his current wife.[6] As Judge Easterbrook

---

[6] McGowan is actually asking this Court to enforce two successive assignments – the first being the consent form that Rosemary signed in 1998 allowing Shirley, his first wife, to be

17

pointed out in his dissenting opinion in <u>Fox Valley</u>, a "waiver" in the ERISA context is not merely a refusal of benefits, but also functions as "an anticipatory gift, to whoever is next in line under the [Plan's] rules[.]" 897 F.2d at 282-83 (Easterbrook, J., dissenting). Rosemary's "waiver" here, if recognized, creates an "indirect arrangement" whereby the Plan benefits are transferred to Donna, who in turn gains an "interest enforceable against the plan." These actions therefore fit within the definition of "assignment or alienation" provided in 26 C.F.R. § 1.401(a)-13(c)(1)(ii). Thus, even though ERISA does not expressly state that "waivers" are prohibited, recognition of the waiver sought in this case would undermine § 1056(d)(1).

Finally, it is worth noting that any concern for the ability of individuals to freely and voluntarily relinquish certain rights in their former spouses' ERISA plan benefits upon divorce has already been addressed by Congress through the passage of the QDRO provision in 1984. The Supreme Court in <u>Boggs</u> emphasized the care with which Congress created the QDRO mechanism in order "to give enhanced protection to the spouse and dependent children in the event of divorce or separation[.]" <u>Boggs</u>, 520 U.S. at 847. The Court also made clear that the QDRO exception to § 1056(d)(1) is to be narrowly construed and is "not subject to judicial expansion." <u>Id.</u> at 851. As such, recognition of additional methods of dispersing ERISA benefits in the event

named as beneficiary, and the second being his present action seeking to replace Shirley with Donna, his current wife.

18

of a divorce would be inconsistent with this comprehensive
scheme.

> The surviving spouse annuity and QDRO
> provisions, which acknowledge and protect
> specific pension plan community property
> interests, give rise to the strong implication that
> other community property claims are *not
> consistent with the statutory scheme*. ERISA's
> silence with respect to the right of a
> nonparticipant spouse to control pension plan
> benefits by testamentary transfer provides
> powerful support for the conclusion that the
> right does not exist.

Id. at 847-48 (emphasis added) (citing Mass. Mut. Life Ins.
Co. v. Russell, 473 U.S. 134, 147-48 (1985)).

Applying this reasoning to the case at hand, ERISA's
silence with respect to the right to waive benefits supports the
conclusion that such a right does not exist. The
comprehensive nature of the QDRO provision suggests that
Congress provided only one option to individuals in
McGowan's position. In other words, the QDRO provision,
which recognizes the right to designate alternate payees under
certain circumstances, "give[s] rise to the strong implication
that" the designation of alternate payees under other
circumstances (i.e. through waivers) is "not consistent with
the statutory scheme," Id.

19

In sum, McGowan was required to satisfy the very specific requirements of § 1056(d)(3) in order to change beneficiaries, and he has provided no reason why he could not have obtained a QDRO from the Florida state courts effectuating Rosemary's intent to be removed as the beneficiary under the Plan at the time of the divorce. He should not now be able to circumvent the requirements of § 1056(d)(3), as well as the requirements of § 1104(a)(1)(D), by couching this change of beneficiaries in "waiver" terms.

B.    *Civil Penalties Under 29 U.S.C. § 1132(c)*

Count II of McGowan's Complaint alleged that NJNG violated ERISA by failing to furnish requested Plan documents within 30 days of his initial request and sought civil penalties under 29 U.S.C. § 1132(c). NJNG concedes that McGowan's attorney made an initial request for copies of relevant Plan documents on June 19, 2002. NJNG also concedes that the company failed to comply with this request until October 28, 2002 (five days after McGowan's attorney made a second request). NJNG argues, however, that they were acting under a good faith (but mistaken) belief that the June 19th letter did not put them on notice of McGowan's request for documents.

Section 1132(c) grants the District Court broad discretion in deciding whether to impose civil penalties for delayed discovery. <u>Bruch</u>, 828 F.2d at 153. This Court has held that a district court "would be well within its discretion in setting damages at $0" if, for example, "the employee's claim for benefits is not colorable, and if the employer

20

displayed no bad faith in responding to the claim. . . ." Id. Here, the District Court based its decision to set damages at zero on the determination that NJNG did not act in bad faith. Even though the District Court held that the June 19th letter, when objectively viewed, was a valid request under § 1132(c), the court determined that NJNG was under a subjective good faith belief that they did not yet have to furnish the requested documents. Nothing has been presented to this Court which would cause us to question the District Court's conclusion that the NJNG did not act in bad faith. We therefore find no abuse of discretion on the part of the District Court in this case.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the July 26, 2004, Order and Opinion of the District Court denying McGowan's Motion for Summary Judgment and granting summary judgment in favor of NJNG.

*McGowan v. NJR Service Corporation; New Jersey Natural Gas Company*, No. 04-3620

BECKER, *Circuit Judge*, concurring.

I agree with the result reached in Part III.A of Judge Van Antwerpen's opinion, which holds that we should embrace the "minority rule," thus rendering ineffective Rosemary's purported waiver of her rights as beneficiary and

21

McGowan's subsequent nomination of his present wife, Donna, as the new beneficiary. I also agree with Judge Van Antwerpen's disposition, in Part III.B, of the civil penalties issue. As the foregoing suggests, I join in the judgment affirming the District Court.

Judge Van Antwerpen relies on three theories to support his conclusion that Rosemary's waiver is ineffective. First, he reasons that, because the Plan documents in this case designate Rosemary as the beneficiary, any requirement imposed on Plan administrators to look beyond these documents would violate the specific command of 29 U.S.C. § 1104(a)(1)(D). Second, and relatedly, he argues that this holding is necessary to promote one of the principal goals underlying ERISA—ensuring that "plans be uniform in their interpretation and simple in their application." *McMillan v. Pratt*, 913 F.2d 310, 312 (6th Cir. 1990). Third, he points out that recognition of Rosemary's waiver in this case would contravene ERISA's prohibition of assignment or alienation of benefits under 29 U.S.C. § 1056(d)(1). I write separately to explain why I disagree with the first and second justifications, and thus do not join Part III.A.1. I agree with the third justification, and thus join Part III.A.2. However, since Judge Van Antwerpen's discussion of that point is brief, I think it useful to expand upon it, and begin with that issue.

I.

The anti-alienation or spendthrift provision, 29 U.S.C. § 1056(d), provides:

22

Assignment or alienation of plan benefits

(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

As Judge Van Antwerpen notes, "assignment" or "alienation" is defined by regulation to include:

Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

26 C.F.R. 1.401(a)-13(c)(1)(ii).[7] Under this definition, I think that the purported waiver in this case was clearly a prohibited assignment or alienation. Rosemary's waiver was more than a renunciation of her right to benefits under the plan; rather, it was an attempt to transfer her interest in the plan to McGowan, with the expectation that he would then be permitted to assign that interest to someone else, as he in fact attempted to do on two separate occasions. I see nothing in the anti-alienation provision that excepts transfers from plan

---

[7]Neither party has challenged the validity of this definition, and the Supreme Court's reliance on it in *Boggs v. Boggs*, 520 U.S. 833, 851 (1997), suggests that we owe it deference.

beneficiaries to plan participants, particularly when the plan participant then seeks to transfer that interest to a third party. The purported waiver in this case fits squarely within the definition of assignment or alienation as an "indirect arrangement . . . whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan."

In this context, it is also useful to reference the QDRO provisions, for they shed additional light upon the subject. Congress added the QDRO provisions at the same time it required plans to offer benefits in the form of qualified joint and survivor annuities. *See* Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 (1984). I believe that Congress saw QDROs as the only means by which a participant or beneficiary could assign or alienate his or her interest in the plan.[8] This is confirmed by the language from

---

[8]While I join in Part III.A.2 of the majority opinion, believing that Judge Van Antwerpen correctly interprets the Supreme Court's discussion of the QDRO provision in *Boggs v. Boggs*, 520 U.S. 833 (1997), I feel constrained to note that the Supreme Court's congressional silence jurisprudence is somewhat of a patchwork. To be sure, a number of cases use silence as evidence of legislative intent, *see, e.g.*, *Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs*, 461 U.S. 624, 632-33 (1983); *Johnson v. Transportation Agency*, 480 U.S. 616, 629 n.7 (1987). However, Justice Scalia dissented in Johnson, delivering a critique of the majority's discussion of silence. First, Justice Scalia argued that the assumption that Congress's failure to

the 1984 Senate Report noting that, absent a QDRO, the participant's first spouse is still entitled to benefits upon the participant's death.[9]  Since the waiver at issue in this case was

---

amend a statute demonstrates that a prior judicial interpretation of the statute is correct should be abandoned because "[i]t is based. . .on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant." *Id*. at 671 (Scalia, J., dissenting).  Justice Scalia also argued that it is impossible to determine whether congressional silence demonstrates "(1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice."  *Id.* at 672.

Moreover, a number of cases have rejected silence as evidence of legislative intent.  *See e.g. Fogerty v. Fantasy, Inc*. 510 U.S. 517, 527-33 (1994); *Borough of Ridgefield v. New York Susquehanna & Western Railroad*, 810 F.2d 57, 60 (3d Cir. 1987).

[9]The Report stated:

> The bill provides that a qualified joint and survivor annuity is not required to be provided by a plan unless the participant and spouse have been married throughout the one-year period ending on the earlier of (1) the participant's annuity starting date (the first day of the first period for which an amount is received as an annuity (whether by

not a QDRO, it is prohibited by ERISA's anti-alienation clause.

Nevertheless, some courts have concluded that the anti-alienation clause was intended solely to prevent the participant from alienating his or her benefits and should not act to prevent a secondary beneficiary from alienating his or her rights. For instance, Judge Harlington Wood, Jr., speaking for the full Court of Appeals for the Seventh Circuit, stated:

> reason of retirement or disability)), or (2) the date of the participant's death. *If a participant dies after the annuity starting date, the spouse to whom the participant was married during the one-year period ending on the annuity starting date is entitled to the survivor annuity under the plan whether or not the participant and spouse are married on the date of the participant's death.* The rule does not apply, however, if a qualified domestic relations orders . . . otherwise provides for the division for payment of the participant's retirement benefits. *For example, a qualified domestic relations order could provide that the former spouse is not entitled to any survivor benefits under the plan.*

S. Rep. No. 98-575, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2561-62 (emphasis added).

> The spendthrift provisions of ERISA are designed to "ensure that the employee's accrued benefits are actually available for retirement purposes," by preventing unwise assignment or alienation. These provisions focus on the assignment or alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary.

*Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 279 (7th Cir. 1990) (en banc) (citation omitted); *see also Estate of Altobelli v. International Business Machines Corp.*, 77 F.3d 78, 81 (4th Cir. 1996) ("We agree with the Seventh Circuit that the anti-alienation clause does not apply to a beneficiary's waiver.").

This approach is not without appeal. It does seem untoward that McGowan should not be able to have his pension awarded to his present wife, rather than to a woman from whom he is long divorced. The anti-alienation clause, however, does not distinguish between benefits provided to participants and those provided to secondary beneficiaries; rather, it simply states that "benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). Additionally, while the legislative history supports the view that the purpose of the clause was to prohibit a spendthrift from unwisely selling his or her interests in a plan, there is no reason why this focus of this concern should be limited to plan *participants*. If, hypothetically, McGowan were still married to Rosemary, but she wanted to sell her rights under the plan, I believe that most courts would find such a sale to

27

be prohibited.  This view finds support in Judge Easterbrook's dissenting opinion in *Fox Valley*:

> Although the majority holds that this rule applies only to "participants" in a pension plan as 29 U.S.C. § 1002(7) defines that term, it is not so limited.   Section 1056(d)(1) bars the assignment of "benefits"—that is, payments under the plan—without regard to the identity of the person making that assignment. Section 1056(d)(2) reinforces this in saying that "a loan made to a participant or beneficiary shall not be treated as an assignment or alienation", an exemption unnecessary if the anti-alienation clause does not apply to beneficiaries in the first place. So Laurine could not have transferred the money to Dessie in exchange for a sofa—at least, Dessie could not have enforced the promise by attaching the benefits as they came in. Why, then, should Laurine be allowed to transfer the money to Dessie without getting a sofa?

897 F. 2d at 283 (Easterbrook, J., dissenting).

In view of the foregoing, I do not see how the fact that McGowan and Rosemary are divorced changes this analysis. Since the waiver in this case occurred in the context of a divorce settlement, it would not be unreasonable to assume that Rosemary received something—perhaps not a sofa, but probably a greater share of some other portion of McGowan's

28

assets—in return for her agreement to waive her interest in McGowan's pension plan. While Congress may have only intended to bar the "unwise" alienation of benefits, the plain language of the anti-alienation clause prohibits us from inquiring into the wisdom of a beneficiary's decision to transfer her interest to someone else.

Finally, as Judge Van Antwerpen correctly notes, this interpretation finds further support in *Boggs*. In that case, the Court held that the anti-alienation clause preempted a state law permitting a testamentary transfer by a plan beneficiary. *See* 520 U.S. at 851. At the very least, *Boggs* stands for the proposition that the anti-alienation clause applies equally to beneficiaries and participants, and thus it implicitly rejects the reasoning relied on by the Seventh Circuit in *Fox Valley*.

For all these reasons, I agree with Judge Van Antwerpen that the anti-alienation clause prohibits Rosemary's waiver.

II.

A.

Most courts adopting the minority rule have not relied on ERISA's anti-alienation clause; rather, like Judge Van Antwerpen, they have looked to 29 U.S.C. § 1104(a)(1). That section provides:

. . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

. . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

Judge Van Antwerpen concludes that this provision "dictates that it is the documents on file with the Plan, and not outside private agreements between beneficiaries and participants, that determine the rights of the parties." *See* Maj. Op. at 9. I am not persuaded that this is the case. In my view, § 1104(a)(1)(D) simply embodies the common-sense notion that a plan administrator should not take actions that are inconsistent with the plan's guidelines. Nothing in the language prohibits the administrator from consulting other documents, insofar as those documents do not conflict with the language of the plan. Indeed, an administrator must consult other documents to determine whether a participant has obtained a valid QDRO.

In this regard, it is important to note that the provision authorizing QDROs explicitly states that such orders are exempt from ERISA's anti-alienation clause but says nothing

whatsoever about § 1104(a)(1)(D). This suggests that Congress simply did not see a conflict between the requirement that plan administrators perform their duties "in accordance with the documents and instruments governing the plan" and the requirement that they give effect to a transfer of benefits pursuant to a QDRO, underscoring my view that the real obstacle to the waiver in this case is the anti-alienation clause, not § 1104(a)(1)(D).

The plan documents in this case do not explicitly prohibit waivers of the sort Rosemary sought to execute.[10] Rather, the documents mirror the statutory language regarding the ability of a participant to waive the qualified joint and survivor annuity provided his spouse consents and does so prior to the date the spouse begins receiving benefits. Thus,

---

[10]The applicable provision reads:

> The Participant may exercise his right to elect an optional form of benefit at any time during the election period specific in paragraph (b) below; provided, however, that such election . . . shall be effective only if made in writing on a form provided by the Committee for that purpose, signed by the Participant and delivered to the Committee during the election period. Such election form shall provide for the Participant to certify (i) that he revokes the automatic surviving spouse option or (ii) that he elects to be covered under such option . . . .

31

the Plan documents do not prohibit waivers of the sort at issue here.

B.

Judge Van Antwerpen also argues, in accord with many of the courts that have adopted the minority rule, that concerns of efficiency and uniformity justify refusing to permit a beneficiary to waive her right to benefits. I am not persuaded by this argument. While Congress clearly intended to promote the uniform and efficient operation of plans, I agree with McGowan that the increased burden on the plan in this case would be minimal, particularly in light of the fact that plan administrators must already review external documents to determine whether they qualify as QDROs.

Judge Van Antwerpen argues that it is inherently easier for plan administrators to evaluate purported QDROs, because the statutory authorization for such agreements provides specific criteria for doing so. But I see nothing that would prohibit us from using our authority to fashion federal common law in this area to develop similarly clear criteria for evaluating purported waivers.

In addition, as both parties acknowledge, plan administrators would need to make further actuarial calculations when a beneficiary waives her right to benefits. But administrators already need to make such calculations in the context of QDROs, and indeed in most cases of this genre. These kinds of calculations are *de rigeur* for plan administrators; it is the "stuff" of their work. Thus, while

there would be some additional burden, I do not think it is nearly as great as Judge Van Antwerpen suggests.

III.

For the above reasons, while I do not agree with some of the justifications offered in Judge Van Antwerpen's opinion, I concur in the result and in the judgment. The plain language of ERISA prohibits waivers of the type at issue here, so we have no choice but to affirm the decision of the District Court.

*McGowan v. NJR Service Corporation; New Jersey Natural Gas Company*, No. 04-3620

Fuentes, <u>Circuit Judge</u>, dissenting.

I disagree with the result reached by Judge Van Antwerpen and Judge Becker, that, although Rosemary knowingly and voluntarily signed a waiver of her pension benefits, in accordance with a negotiated and court-approved divorce settlement, the waiver is not permitted under ERISA. The primary question here is whether Rosemary may waive her pension benefits despite ERISA's anti-alienation provision, which bars alienation or assignment of pension benefits absent a particular order not present here. This question is the subject of a long-standing "circuit split," the minority position of which is adopted by my colleagues today.

Because I believe that both ERISA and the Plan are silent on the enforceability of waivers of benefits (as waivers are neither alienations nor assignments), and that federal common law ought to fill this gap by respecting the time-honored principle of state autonomy in the domestic law area, I would allow waivers of sufficient specificity to be given effect. I therefore respectfully dissent.[11]

### A. ERISA's Anti-Alienation Clause

My colleagues agree that ERISA's anti-alienation (or "spendthrift") clause, 29 U.S.C. § 1056(d), bars the waiver in this case. I, however, agree with the Courts of Appeals that have found that the anti-alienation provision does not address waivers. See, e.g., Estate of Altobelli v. Int'l Bus. Mach. Corp., 77 F.3d 78, 81 (4th Cir. 1996); Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 280 (7th Cir. 1990) (en banc); cf. Metro. Life Ins. Co. v. Hanslip, 939 F.2d 904, 907 (10th Cir. 1991) (noting that an "applicable divorce decree" may change a beneficiary designation); Lyman Lumber Co. v. Hill, 877 F.2d 692, 693 (8th Cir. 1989) (finding that no provision of ERISA addresses waiver).[12] ERISA is a detailed

------

[11]I join Judge Van Antwerpen's opinion as to Part III.B.

[12]I find it immaterial that the waiver here took place after McGowan's retirement. But see Anderson v. Marshall, 856 F. Supp. 604, 607 (D. Kan. 1994). The Plan here does contain an anti-revocation provision, modeled after 29 U.S.C. § 1055(c), which bars revocation of the pension benefit involved here after

and carefully worded statute, and I am wary of expanding the prohibitions in § 1056(d) beyond those specifically enumerated by Congress. Cf. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) ("[W]e have noted that ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.") (internal quotations omitted).

As my colleagues recognize, absent a Qualified Domestic Relations Order ("QDRO"), the anti-alienation clause bars only assignments and alienations of benefits; it makes no reference to waivers. An "alienation" is a "[c]onveyance or transfer of property to another." Black's Law Dictionary 73 (7th ed. 1999) (emphases added). "Assignment" is defined as "the transfer of rights or property." Id. at 115 (emphasis added); see also id. ("'An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another . . . .'") (quoting Alexander M. Burrill, A Treatise on the Law and Practice of Voluntary Assignments for the Benefit of Creditors § 1, at 1 (James Avery Webb 6th ed. 1894)). In contrast, "waiver" is defined as "[t]he voluntary relinquishment or abandonment–express or implied–of a legal right or advantage." Id. at 1574. Waiver does not involve a transfer of

retirement. However, a revocation (with consent) of one's election to a benefit is materially different from a waiver of benefits by a vested beneficiary, as the language of § 1055(c) appears to be a limitation only on the participant's actions, rather than on the beneficiary's actions.

rights; it is merely a relinquishment. Congress understands this distinction between a waiver and an assignment, see 5 U.S.C. § 8465,[13] and chose only to prohibit the latter (along with alienations) in the anti-alienation provision of ERISA.

I find the distinction between waiver and assignment or alienation to be a significant one. The anti-alienation provision serves specific purposes. It prevents spouses who have been given rights and benefits under a plan from unwisely squandering those rights. For example, it safeguards against unscrupulous predators preying upon participants and beneficiaries by offering inadequate immediate gratification in

_____

[13]Section 8465, which governs the Federal Employees' Retirement System and is entitled "Waiver, allotment, and assignment of benefits," reads:

> (a) An individual entitled to an annuity payable from the Fund may decline to accept all or any part of the amount of the annuity by a waiver signed and filed with the Office. The waiver may be revoked in writing at any time. Payment of the annuity waived may not be made for the period during which the waiver is in effect.
> (b) An individual entitled to an annuity payable from the Fund may make allotments or assignments of amounts from the annuity for such purposes as the Office considers appropriate.

§ 8465 (emphases added).

exchange for the long-term benefits ERISA is designed to guarantee. See Coar v. Kazimir, 990 F.2d 1413, 1420 (3d Cir. 1993)[14] (noting that the legislative history of the anti-alienation provision suggests that it was "intended to protect plan beneficiaries by ensuring that plan assets are used only for payment of benefits") (internal quotation omitted). These concerns are not nearly as strong with respect to waiver, as waiver is not likely to be induced by an offer from an unscrupulous, predatory character. Only the participant would derive benefits from a waiver (as one cannot waive rights to a third party), whereas anyone could pay a beneficiary for an assignment or alienation. Another concern animating the anti-alienation provision is creditor's access to benefits, which is notably absent here.[15] See Coar, 990 F.2d at 1420-21 (noting that "we do not believe that Congress intended the

[14]Similar to the set-off in Coar, the waiver here is conceptually distinct from assignment and alienation. Accordingly, our comment that "inasmuch as a set-off is not an alienation, then the absence of an exception allowing a set-off to the restraint on alienation is meaningless" applies with equal force here. Coar, 990 F.2d at 1424.

[15]We also noted in Coar that the legislative history of the provision speaks of "a garnishment or levy" and that the there are remarks in the history that term it an "anti-garnishment provision." 990 F.2d at 1420-21. Congress's concern regarding this sort of involuntary alienation further underscores my belief that it was not targeting knowing and voluntary waivers when drafting the provision.

anti-alienation provision to dilute the potential relief available to pension beneficiaries. Instead, we read section 206(d)(1) and, by extension [Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365 (1990)], as shielding only the beneficiaries' interest under the pension plan from third-party creditors.").

Both of my colleagues find much import in 26 C.F.R. § 1.401(a)-13(c)(1)(ii), a regulation promulgated by the Internal Revenue Service concerning the anti-alienation provision. The regulation interprets the statute as covering "[a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan." Id. As noted by my colleagues, allowing McGowan's subsequent and independent attempt to nominate Donna appears to transform Rosemary's waiver into an indirect assignment, as described by 26 C.F.R. § 1.401(a)-13(c)(1)(ii). However, such a reading allows third-party actions to invalidate what would otherwise be valid waivers. Indeed, the majority would appear to prohibit all waivers, even though in many cases, there will be no "renomination" at issue. The majority's argument also puts the cart before the horse, inasmuch as it presupposes that the Plan must give effect to McGowan's renomination of Donna. Were the combination of the waiver and the nomination to create a prohibited indirect assignment, only the latter action should be invalidated, as it is that action that creates the problematic arrangement.[16] Conceiving of the waiver as an acquisition of

_____

[16]Although I would have remanded the question whether the renomination of Donna  for the annuity option should be given

rights by McGowan himself is also untenable, as he would not get rights to the benefit involved here (a survivor annuity) if the waiver is given effect. Instead, the right to the annuity would be destroyed by the waiver.

In Boggs v. Boggs, the Supreme Court "consider[ed] whether [ERISA] pre-empts a state law allowing a nonparticipant spouse to transfer by testamentary instrument an interest in undistributed pension plan benefits." 520 U.S. 833, 835-36 (1997). The Court addressed whether state community property law was preempted by ERISA, and the Court rejected the argument that ERISA simply did not speak to the issue. It found that it could "begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects" and held "that there is a conflict, which suffices to resolve the case." Id. at 841. All of the cases considering Boggs's effect on waivers of the sort considered here recognize that ERISA broadly preempts state

_____

effect, I note that there are good reasons not to honor it. If no renomination is allowed, waiver could only occur once, so there would be no danger of repeated divorces causing high administrative costs based on the need to do several actuarial recalculations. However, this is not to say that Donna would be without protection, as the waiver would likely result in the lump-sum death benefit under Section 6.2 of the Plan (as opposed to the survivor annuity under Option B of Section 8.2) going into effect, as the annuity option would then not be effective. Indeed, McGowan could change beneficiaries for the lump-sum benefit freely under Section 6.3.

law, and go on to find that the federal common law approach is not in conflict with the holding of Boggs. See, e.g., Manning v. Hayes, 212 F.3d 866, 873 (5th Cir. 2000) (holding that Boggs does not cast doubt on Brandon v. Travelers Ins. Co., 18 F.3d 1321 (5th Cir. 1994)); Metro. Life Ins. Co. v. Pettit, 164 F.3d 857, 864 (4th Cir. 1998) (reaffirming Altobelli after Boggs). Importantly, when discussing the surviving spouse annuity (which is the benefit here), the Boggs Court noted that the wife "has not waived her right to the survivor's annuity." 520 U.S. at 842. Also, the Court, noted that the "anti-alienation provision can 'be seen to bespeak a pension law protective policy of special intensity: Retirement funds shall remain inviolate until retirement.'" Id. at 851 (quoting J. Langbein & B. Wolk, Pension and Employee Benefit Law 547 (2d ed. 1995)). Here, Rosemary's waiver occurred after McGowan's retirement.

However, some of the language in Boggs may cast doubt on the policies behind the majority rule. The Court stated that the "principal object [of ERISA] is to protect plan participants and beneficiaries." Id. at 845 (emphasis added). This language seems to conflict with the language in the Fox Valley majority opinion discussing how the QDRO provision is meant to protect participants, not beneficiaries. Compare id. at 847 ("In creating the QDRO mechanism Congress was careful to provide that the alternate payee, the 'spouse, former spouse, child, or other dependent of a participant,' is to be considered a plan beneficiary.") (quoting §§ 1056(d)(3)(K) & (J)), with Fox Valley, 897 F.2d at 279 (noting that the anti-alienation provision "focus[es] on the assignment or alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary"). Similarly, the Court noted

-40-

that "[t]he QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during their retirement as a means of income." Id. at 854; see also id. at 853 ("Even a plan participant cannot defeat a nonparticipant surviving spouse's statutory entitlement to an annuity."). I agree with my colleagues that Boggs makes clear that the anti-alienation clause provides a restraint on actions by both participants and beneficiaries. However, that does not change my view that the provision does not speak to waivers.

Given the silence of the anti-alienation provision on the issue of waiver, I find it inapplicable here. I agree with Judge Becker, for the reasons he states, that the fiduciary duty provision of ERISA, 29 U.S.C. § 1104(a)(1)(D), is of no import here.[17] Because the QDRO exception applies only to

---

[17]I note also that Judge Van Antwerpen's opinion reads this provision as allowing all documents filed with the Plan to govern its administration, including forms filed to designate beneficiaries. However, although I need not resolve this issue because this case is ultimately decided only on the anti-alienation provision, I note in passing that the governing documents could reasonably be limited to those that set forth the terms of the plan. Cf. McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan for U.S. Employees, 340 F.3d 139, 143-44 (3d Cir. 2003) ("Clearly, the 'documents and instruments governing the plan' do not necessarily include all relevant documents and, in particular, do not necessarily include the plaintiff's claim file.").

assignments and alienations, it is also irrelevant to this case. See Fox Valley, 897 F.2d at 279 ("The QDRO requirements specify the procedures necessary to assign benefits, but those procedures need not be followed when a nonparticipant is waiving an interest in pension benefits. ERISA allows beneficiaries to waive their interests in benefits.").

In accord with the majority of the courts of appeals that have faced the issue, given the comprehensive nature of ERISA, its broad preemptive scope, and its goal of uniformity in the law of employee benefit plans, I believe that ERISA's silence on waiver should be filled by federal common law. See McGurl v. Trucking Employees of North Jersey Welfare Fund, Inc., 124 F.3d 471, 481 (3d Cir. 1997) ("'[W]here state law is preempted and no specific federal provision governs, a court is forced to make law or leave a void where neither state nor federal law applies. In such a situation it is a reasonable inference that Congress intended some law, and therefore federal law, to apply.'") (quoting Wayne Chem., Inc. v. Columbus Agency Serv. Corp., 426 F. Supp. 316, 322 (N.D. Ill. 1977)); see also Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 n.8 (3d Cir. 1993) ("[Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989)] authorizes the federal courts to develop federal common law to fill gaps left by ERISA.").

## B.     Federal Common Law

My conclusion that federal common law should fill the gap in ERISA concerning the enforceability of waivers does not end the inquiry, as it must be determined whether, and in what instances, federal common law should recognize waivers.

-42-

Allowing waiver fulfills the intent of the parties to a divorce, allows spouses broader room to negotiate during the settlement of property attendant to divorce, and comports with longstanding common law domestic relations rules. The Fox Valley majority reasoned that, because ERISA does not prohibit or preempt a waiver and because enforcement will not create an undue burden for plan administrators, a proper waiver should be given effect. 897 F.2d at 279-80; see also Altobelli, 77 F.3d at 81-82.

I agree with Judge Becker that the enforcement of waivers would not lead to disuniformity and complexity in the administration of ERISA plans. The Fox Valley court also disagreed with the suggestion that its "decision imposes burdensome obligations on plan administrators," stating that "[n]o such additional burdens will be imposed because, under the ERISA statutory scheme, a plan administrator must investigate the marital history of a participant and determine whether any domestic relations orders exist that could affect the distribution of benefits." 879 F.2d at 282. The Fifth Circuit has also discussed the "long and venerable history" of "[f]ederal respect for state domestic relations law" in support of the federal common law approach. Brandon, 18 F.3d at 1326 (quoting De Sylva v. Ballentine, 351 U.S. 570, 580 (1956) (citations omitted)). I find the reasoning of the Fox Valley and Brandon courts to be compelling.

Although I find that federal policy favors giving effect to waivers, it is still unclear whether federal common law should (1) allow waivers to be given effect if the plan provisions do not specifically prohibit it or (2) mandate that waivers be given effect notwithstanding any plan provisions to the contrary. Although the former option may be more in line with § 1104(a)(1)(D) (the fiduciary duty provision), the better option is the latter, which promotes uniformity and certainty in plan

administration. However, given that the Plan here is silent on waiver, this case does not mandate resolution of this issue, as Rosemary's waiver should be given effect under either approach.

Although in some cases there may be a dispute over whether particular language in a divorce settlement is specific and definite enough to constitute waiver of a pension benefit, there is no serious dispute here as to whether Rosemary's waiver was insufficient. It clearly identified the Plan and waives all rights to benefits under the Plan. Accordingly, I would give effect to Rosemary's waiver.