**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JANIS CARMONA,
                                    *Plaintiff,*

            v.

JUDY CARMONA; HILTON HOTELS
CORPORATION, Retirement Plan,
                                    *Defendants,*

            v.

NEVADA RESORT ASSOCIATION
INTERNATIONAL ALLIANCE OF
THEATRICAL AND STATE EMPLOYEES
LOCAL 720 PENSION TRUST
(I.A.T.S.E. Trustees),
            *Cross-claimant-Appellant,*

            v.

JUDY CARMONA, Successor
representative of Lupe N.
Carmona deceased,
            *Cross-defendant-Appellee.*

No. 06-15581

D.C. No.
CV-04-01310-
KJD/RJJ

| | |
|---|---|
| JANIS CARMONA, a.k.a. JANIS KESTER, *Plaintiff-Appellant,* v. JUDY CARMONA, Successor Representative of Lupe N. Carmona Deceased; HILTON HOTELS CORPORATION, Retirement Plan, *Defendants-Appellees.* | No. 06-15938 D.C. No. CV-04-01210-KJD/ RJJ ORDER AMENDING OPINION AND DENYING REHEARING AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
March 11, 2008—Phoenix, Arizona

Filed September 17, 2008
Amended May 4, 2010

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

## COUNSEL

William E. Freedman (argued), William E. Freedman, Chartered, Las Vegas, Nevada, for plaintiff/appellant Janis Carmona.

Marshal S. Willick (argued), Willick Law Group, Las Vegas, Nevada, for defendant/cross-defendant/appellee Judy Carmona.

Adam S. Segal (argued), Jessica C. Espinoza, Schreck Brignone, PC, Las Vegas, Nevada, for cross-claimant/appellant Nevada Resort Association International Alliance of Theatrical & State Employees Local 720.

Sheri Ann F. Forbes (argued), Thomas F. Kummer, Kummer Kaempfer Bonner Renshaw & Ferrario, Las Vegas, Nevada, for defendant/appellee Hilton Hotels Corporation, Retirement Plan.

---

**ORDER**

This court's opinion, filed September 17, 2008, is amended as follows:

1.   At pages 13098 (2 times), 13099, 13102, 13113 (3 times including 2 times within note 13) of the slip opinion (544 F.3d at 998 (2 times), 1000, 1007 (3 times including 2 times within note 13)), replace <anti-alienation> with <antialienation> (without hyphen) to conform to the usage in *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 129 S. Ct. 865 (2009).

2.   On page 13090 of the slip opinion (544 F.3d at 993), replace <the Nevada family court, perhaps without taking into account the nature of the QJSA survivor annuities, granted> with <the Nevada family court, perhaps without taking into account either the nature of the QJSA survivor annuities or the terms of the plans, granted>.

3.   On page 13097 of the slip opinion (544 F.3d at 998), following <ERISA pension plans must comply with participation, vesting, and funding requirements. *Id.*> add:

   <The statute also established "a straightforward rule of hewing to the directives of the plan documents,"

imposing on plan administrators a "bright-line requirement to follow plan documents in distributing benefits." *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, ___ U.S. ___, 129 S. Ct. 865, 875, 876 (2009).>

4. Move the following language appearing on page 13100 of the slip opinion (544 F.3d at 999) to page 13099 of the slip opinion (544 F.3d at 998), between <1096 n.5.> and <The qualified>:

<A valid DRO can be any judgment, decree, or order which (1) "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant," and (2) "is made pursuant to a State domestic relations law." 29 U.S.C. § 1056 (d)(3)(B)(ii).>

5. On page 13099 of the slip opinion (544 F.3d at 998), following <*Hamilton*, 433 F.3d at 1096 (citing 29 U.S.C. § 1056(d)(3)(B)(i)(I)) (internal quotation marks omitted).>, add a new footnote 6 (and renumber subsequent footnotes):

To be sure, a party can waive an entitlement to an interest without expressing that waiver in the form of a QDRO, as the Supreme Court recently held. Although the Fifth Circuit had held a waiver by a divorcing spouse expressed in a divorce decree ineffective under ERISA's antialienation provision because it was not expressed in a QDRO, the Court held that such a waiver of rights could be effective nonetheless. *Kennedy*, 129 S. Ct. at 870-74. That ability to alter the entitlement to benefits outside of a QDRO is limited to a waiver of rights, however. It does not permit an assignment of interest to anyone else or an identification of an alternate payee; that

still requires a QDRO to be effective under ERISA. *Id.* at 873.

6.   On page 13100 of the slip opinion (544 F.3d at 1000), replace <Because Janis was Lupe's spouse at the time of his retirement, her remainder interests vested at the time of his retirement and no QDRO can reassign the benefits.> with <Because Janis was Lupe's spouse at the time of his retirement, IATSE argues that her remainder interests vested at the time of his retirement and no QDRO can reassign the benefits.>

7.   On page 13107 of the slip opinion (544 F.3d at 1003), in the citation to *McGowan v. NJR Serv. Corp.* replace <(omitted).> with <(omitted), *abrogated on other grounds by Kennedy*, 129 S. Ct. 865.>.

8.   On pages 13110-11 of the slip opinion (544 F.3d at 1005-06), replace the five paragraphs that begin with <Judy also argues that Janis waived her right> and end before the heading <*C. The Constructive Trust*> with the following two paragraphs:

> Judy also argues that Janis waived her right to the surviving spouse benefits by the property settlement when the state court entered its divorce decree. As the Supreme Court made clear in *Kennedy*, ERISA's antialienation provision does not prohibit a surviving spouse beneficiary from waiving his or her interest in plan benefits, but such a waiver must also conform to plan procedures and instruments. Indeed, the Court concluded that the plan administrator in that case was not, under the terms of the plan, required to honor the waiver of benefits contained in the divorce decree and that the continued payment of benefits to the prior spouse was proper. *See Kennedy*, 129 S. Ct. at 874-78. Under the so-called "plan documents rule," plan administrators must "hew[ ] to

the directives of the plan documents" rather than "examin[ing] a multitude of external documents that might purport to affect the dispensation of benefits" and becoming "drawn into litigation like this over the meaning and enforceability of purported waivers." *Id.* at 876, 877 (internal quotation marks omitted).

Both the IATSE plan documents and ERISA's statutory scheme allow for the waiver of surviving spouse benefits with both spouses' written consent during the benefits election period prior to the participant's retirement. 29 U.S.C. § 1055(c)(3). That procedure was not followed here. Judy has identified nothing in the IATSE plan documents which require the plan administrator to redirect surviving spouse benefits to Judy, who was not, at the time of retirement and vesting, either a present or former spouse. Even if it is assumed that Janis had the authority to disclaim benefits, there is nothing that provides for them to be assigned instead to Judy.

9. On page 13114 of the slip opinion (544 F.3d at 1007), following the sentence <It may not be that all constructive trusts instituted by state courts, particularly those that seek to recover ill-gotten gains, will have a sufficient connection with or reference to an ERISA plan to trigger ERISA's preemption provision.>, add a new footnote 15:

In *Kennedy*, the Court explicitly declined to express a view on whether an action could have been brought to obtain benefits from the former spouse after they had been distributed to her. 129 S. Ct. at 875 n.10.

The opinion, as amended, will thus appear as attached.

With the opinion as amended, the petition for rehearing en banc, filed October 2, 2008, is DENIED. If any party wishes

to file a new petition for rehearing and/or petition for rehearing *en banc*, it may do so within 14 days from the date of this order.

---

## OPINION

CLIFTON, Circuit Judge:

This case requires us to once again navigate the complex statutory scheme set out in the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 832, as amended, 29 U.S.C. § 1001 *et seq.*, and to answer an open question in this Circuit: whether or not a participant to an ERISA regulated Qualified Joint and Survivor Annuity ("QJSA") plan may change the surviving spouse beneficiary after the participant has retired and the annuity has become payable.

The conflict here arises between the final two wives of Lupe Carmona, a participant in two ERISA regulated pension plans, the Hilton Hotels Pension Plan ("Hilton") and the Nevada Resort Association International Alliance of Theatrical and State Employees Local Pension Trust ("IATSE"). Janis Carmona, Lupe's eighth wife and his spouse at the time of his retirement, appeals the district court's dismissal of her complaint for lack of jurisdiction against Hilton and Judy Carmona, Lupe's ninth wife and his spouse at the time of his death.[1] IATSE, Lupe's second pension plan provider, appeals the district court's grant of summary judgment in favor of Judy on its cross-claim. On the merits, both IATSE and Janis argue that Janis, as Lupe's spouse at the time of his retirement, is the rightful surviving spouse beneficiary for the purposes of Lupe's retirement plan because her interest in surviving spouse benefits irrevocably vested at the time of Lupe's retirement.

---

[1]Because they share the same last name, in this opinion we refer to Lupe, Janis, and Judy by their first names.

Joining the Fourth Circuit, as well as a number of other jurisdictions, we hold that QJSA surviving spouse benefits irrevocably vest in the participant's spouse at the time of the annuity start date—in this case the participant's retirement[2] — and may not be reassigned to a subsequent spouse. Applying that conclusion to the judgment entered by the district court in this case, we affirm in part and reverse in part.

## I.   Background

The essential facts of this case are undisputed. Lupe Carmona married his eighth wife,[3] Janis Carmona (nee Kester), in 1988. While they were married, Lupe designated Janis as his survivor beneficiary under two pension plans which provided QJSA benefits, Hilton and IATSE. Under the terms of these plans, Janis would receive a portion of Lupe's monthly pension benefits upon his death if she survived him. After naming Janis as the survivor beneficiary of both plans, Lupe retired and began collecting pension benefits under the plans in 1992. Then, in 1994, Lupe and Janis began divorce proceedings.

Prior to entry of the formal divorce decree, Lupe inquired into whether he could remove Janis as the named survivor

---

[2]"Annuity start date" and "retirement date" are the same date in this case and we use the two terms synonymously. For the purposes of QJSA benefits, the retirement date and the annuity start date are often the same. As a result, most of the cases addressing this issue have also used "retirement date" synonymously with "annuity start date." We recognize that the terms may not always be synonymous: for example, a participant could retire early, but he or she may not receive benefit payments until a later date. For the purposes of this opinion, however, we need not determine what effect an early retirement would have on the vesting rules. We leave to another day whether the same vesting rules apply to a participant's early retirement.

[3]Although Lupe had many wives, the dispute in this case only concerns wives number eight and nine. None of the previous seven wives are involved in the present litigation.

beneficiary. The two plan administrators each refused to change the designated survivor spouse beneficiary and indicated that the designation was irrevocable upon Lupe's retirement. Nonetheless, in its 1997 divorce decree, the Nevada family court, perhaps without taking into account either the nature of the QJSA survivor annuities or the terms of the plans, granted Lupe both the IATSE and Hilton pensions as his sole and separate property. The family court awarded Janis her own pension plan as her sole and separate property as well. Because there was a difference between the value of the pension awarded to Janis and the value of the pensions awarded to Lupe, the court also ordered that Lupe pay Janis $1500 "as and for an equalization of the values of the marital portion of the pensions divided."

In 1997, after his divorce from Janis had been finalized, Lupe married Judy Carmona (nee Walkington), his ninth and final spouse. He petitioned the family court for a Qualified Domestic Relations Order ("QDRO") revoking Janis's designation as the survivor beneficiary of the IATSE and Hilton pensions and substituting Judy, his new wife. Lupe died in 1999. Judy survived him, as did Janis. The day after Lupe's death, the family court concluded that Janis had waived her right to Lupe's pension plan benefits by the divorce decree's allocation of property and that Janis would be unjustly enriched if she remained the survivor beneficiary. To avoid an inequitable result, the court ordered the plan administrators to change the survivor beneficiary from Janis to Judy. Alternatively, if the plans refused or were unable to change the beneficiary, the family court ordered the funds Janis received to be placed in a constructive trust with Judy as the beneficiary.

Janis appealed the family court's decision to the Nevada Supreme Court. In 2003, that court affirmed the family court order and concluded that ERISA did not preempt either the family court's order to change the beneficiaries or the constructive trust placed on the plan proceeds.[4] Janis sought

---

[4]While Janis was pursuing her original appeal through the Nevada system, she also brought suit in Nevada federal district court seeking to

review of the decision by the United States Supreme Court, but the Court denied certiorari.

In 2004, after the Nevada Supreme Court decision, the family court issued another order requiring Janis to deposit the survivor benefit funds into a constructive trust. At the same time, the family court also entered two orders, each labeled as a "Qualified Domestic Relations Order," directing the two plans to pay survivor benefits either to Judy or to the constructive trust. Janis attempted to remove the case to federal court but the federal district court remanded the action back to the family court, concluding that Janis had failed to timely file for removal and, in any event, that the *Rooker-Feldman* doctrine required the court to dismiss the suit for lack of jurisdiction.

This appeal originates from the most recent federal suit filed by Janis against Judy, Hilton, and IATSE. Janis brought suit under 29 U.S.C. § 1132(a)(3) seeking "to enjoin any act or practice which violates any provision [of ERISA] or the terms of the plan." In response to Janis's suit, IATSE Trustees filed a cross-claim against Judy seeking declaratory relief.

The district court concluded that the *Rooker-Feldman* doctrine barred Janis's suit against Judy and Hilton. The court also concluded that neither *Rooker-Feldman* nor res judicata

recover benefits under the terms of the ERISA pension plan. *See* 29 U.S.C. § 1132(a)(1)(B). Janis named the family court judge, Judy's attorneys, the Hilton Plan administrators and Judy in the suit. In 2001, before the Nevada Supreme Court made its final determination in the original case, District Judge Philip M. Pro dismissed the suit against all the defendants except for Hilton, concluding that the court lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine. The district court later dismissed Hilton because Janis could not join Judy, an indispensable party.

Also during this time, Janis declared bankruptcy. The bankruptcy court also concluded that Janis did not have a legal or equitable interest in the survivor benefits from the two QJSAs.

barred IATSE's claim because it was not a party to the prior suits and was not in privity with Janis. On the merits, the district court concluded that ERISA does not preclude a state court from issuing a QDRO substituting an alternate payee for a surviving spouse after a plan participant's retirement. IATSE appeals the district court's denial of summary judgment and subsequent dismissal of its complaint against Judy. Janis appeals the district court's decision that it lacked subject matter jurisdiction over Janis's claims against Hilton and Judy. We consider both appeals together because they arise from the same factual background.

## II.   Discussion

We review an application of the *Rooker-Feldman* doctrine de novo. *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003). The interpretation of ERISA, including whether ERISA preempts state law, is a question of law which we also review de novo. *Metropolitan Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006); *Cleghorn v. Blue Shield of California*, 408 F.3d 1222, 1225 (9th Cir. 2005).

### A.   The Rooker-Feldman Doctrine and Preclusion

We first consider whether any preclusion doctrine prevents Janis from bringing her claims against Judy and Hilton, or IATSE from bringing its declaratory judgment action. We agree with the district court and conclude that the district court lacked jurisdiction, under the *Rooker-Feldman* doctrine, to adjudicate Janis's claims against Judy and Hilton, but that IATSE is not precluded from asserting its cross-claim here.

The *Rooker-Feldman* doctrine takes its name from two Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). It stands for the relatively straightforward principle that federal district courts do not have jurisdiction to hear de facto appeals from state court

judgments. *Noel*, 341 F.3d at 1155. The jurisdictional prohibition arises from a negative inference drawn from 28 U.S.C. § 1257 which grants jurisdiction to review state court decisions in the United States Supreme Court. *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004) (citation omitted). Because it grants jurisdiction to the Supreme Court, section 1257 impliedly prohibits lower federal courts from reviewing state court decisions. *Id.*

**[1]** Stated simply, the *Rooker-Feldman* doctrine bars suits "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indust. Corp.*, 544 U.S. 280, 284 (2005). In practice, the *Rooker-Feldman* doctrine is a fairly narrow preclusion doctrine, separate and distinct from res judicata and collateral estoppel. *See Noel*, 341 F.3d at 1162-64.

We have previously explained how federal courts should distinguish a forbidden de facto appeal of a state court decision that is barred by *Rooker-Feldman* from a suit that is barred by other preclusion principles. A suit brought in federal district court is a "de facto appeal" forbidden by *Rooker-Feldman* when "a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision." *Id.* at 1164. In contrast, if a plaintiff "asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction." *Id.*

**[2]** Although it is often misapplied, we agree with the district court that *Rooker-Feldman* is applicable in this case, and therefore the district court was correct in dismissing Janis's claims for lack of jurisdiction. According to her amended complaint, Janis claimed that the family court orders were based upon an erroneous application of ERISA preemption law and that the family court unlawfully reassigned benefits

in which she had an irrevocable vested interest. She sought relief from the state court orders and prayed for the federal district court to "order that the proceedings in Family Court in case number D181580 be dismissed with prejudice" and to enjoin enforcement of the orders. Thus she was asserting both that her injury was caused by a "legal error or errors by the state court" and that the appropriate remedy was "relief from the state court judgment." *Kougasian*, 359 F.3d at 1140.

The types of claims Janis presented in this case parallel those asserted in *Feldman*, 460 U.S. 462, one of the cases from which the doctrine takes its name. In *Feldman*, the federal plaintiffs sought admission to the District of Columbia bar. The local court refused to grant the plaintiffs waivers from the local rule that only graduates from accredited law schools could sit for the bar exam. The plaintiffs then filed suit in federal court. The plaintiffs sought declaratory judgments that the rule violated the Fifth Amendment, and injunctions that would require the defendants to permit them to take the examination. One of the plaintiffs also sought the alternative relief of admission to the bar or a determination of whether his training provided him the same competence as graduates of accredited law schools. *See Feldman*, 460 U.S. at 468-69. The appeals were consolidated and the Supreme Court held that the suit was a de facto appeal of the local court order to the extent that it sought review of the local court's denial of waiver. As such the district court lacked subject matter jurisdiction to hear the appeal. *Id.* at 482.

**[3]** Like *Feldman*, Janis did not argue that either Judy or Hilton caused her injury, claims that would not be within the limits of *Rooker-Feldman*. *See Noel*, 341 F.3d at 1163. Rather, Janis complained of a "harm caused by a state court judgment that directly withholds a benefit from [her] . . . based on an allegedly erroneous ruling by that court." *Id.* Her claim therefore fits within the narrow constraints of the Ninth Circuit's application of the *Rooker-Feldman* doctrine. We agree with the district court that it lacked jurisdiction to hear

the merits of Janis's claims against Hilton and Judy because Janis's suit was a forbidden de facto appeal of a state court judgment.

**[4]** Janis also argues that *Rooker-Feldman* does not apply to state court orders that conflict with ERISA because ERISA grants exclusive jurisdiction to the federal courts. *Rooker-Feldman*'s jurisdictional bar is one of congressional intent and not constitutional mandate. *Mozes v. Mozes*, 239 F.3d 1067, 1085 n.55 (9th Cir. 2001). Where Congress explicitly grants exclusive jurisdiction to federal courts, *Rooker-Feldman* cannot bar collateral review of a state court order in federal court. *See In re Gruntz*, 202 F.3d 1074, 1078-79 (9th Cir. 2000) (en banc) (establishing that collateral review of state court proceedings in habeas and bankruptcy cases is not jurisdictionally barred under *Rooker-Feldman*); *see also Mozes*, 239 F.3d at 1085 n.55; *G.C. and K.B. Inv., Inc. v. Wilson*, 326 F.3d 1096, 1103 n.4 (9th Cir. 2003).

**[5]** Although the present suit, as pleaded, arises under the exclusive jurisdiction of federal courts, when the parties proceeded initially, the state court had concurrent jurisdiction to hear the ERISA claim under 29 U.S.C. § 1132(a)(1)(B). In the state court proceedings, Janis failed to remove the proceedings to federal court and thus implicitly subjected herself to the final determination of the state court. Because Congress had established concurrent jurisdiction at that time, we conclude that it did not intend to prevent the *Rooker-Feldman* jurisdictional bar.

**[6]** Although Janis's claims are barred, IATSE's cross claim against Judy is not, even though it raises the same legal issue. Neither the law of the case doctrine nor state law res judicata principles bar IATSE's cross claim. The law of the case doctrine only applies to successive appeals in the same suit. *See Hsu v. County of Clark*, 173 P.3d 724, 730 n.26 (Nev. 2007). Where the suit involves a new party and new

claims, as it does here, it is only res judicata, and not the law of the case doctrine, that may apply. *See id.*

**[7]** Similarly, res judicata does not preclude IATSE from establishing its obligations with respect to Judy and Janis. Under Nevada law, the party asserting res judicata must establish (1) the identical issue was already decided, (2) there was a final judgment on the merits, and (3) the suit involved the same party or their privies. *See Holcombe v. Hosmer*, 477 F.3d 1094, 1097-98 (9th Cir. 2007); *Bennett v. Fid. & Deposit Co. of Md.*, 652 P.2d 1178, 1180 (Nev. 1982). Res judicata does not apply here because IATSE was not a party to the first state court suit nor was it in privity with Janis. Although they advance similar arguments with a similar goal in mind—to establish that Lupe was precluded from changing Janis's beneficiary status after his retirement—they each maintain unique interests. IATSE must concern itself with the correct administration of its pension plans, and it has fiduciary duties distinct from the interests of the wives in this case. *See, e.g.,* 29 U.S.C. § 1104. Janis's interest is merely in receiving the remainder benefits to which she feels she is entitled. Because Janis and IATSE do not share an identity of interests, Janis's prior suits have no preclusive effect on IATSE's claim that the state court QDROs were insufficient to transfer benefits.[5] *See Taylor v. Sturgell*, 128 S.Ct. 2161 (2008) (overruling

---

[5]In addition to illustrating the pitfalls of interpreting ERISA, this case also illustrates the problems that arise when a plan trustee fails to join litigation until the eleventh hour despite the plan's ongoing interest in the outcome. Although we conclude that no legal doctrine prohibits IATSE from bringing the present declaratory judgment action, we agree with the district court that the plan trustee's failure to join itself to the litigation earlier was unnecessary and could have spared the parties involved great time and expense. We also note that while the result here may seem anomalous—IATSE may pay out benefits to Janis while Hilton may pay out benefits to Judy—we conclude that this is the result dictated by the unusual circumstances before us. The application of preclusion doctrines and jurisdictional bars cannot turn on the outcome of the underlying arguments on the merits.

*Kourtis v. Cameron*, 419 F.3d 989, 998 (9th Cir. 2005) and narrowly construing circumstances in which a non-party may be bound by prior judgment); *LaForge v. State, Univ. and Cmty. College Sys. of Nev.*, 997 P.2d 130, 133 (Nev. 2000). We turn now to the merits of the case, and the heart of the ERISA question.

### B.    The Effect of a Domestic Relations Order on Survivor Benefits

Congress originally enacted ERISA to protect the rights of workers who earn pension benefits and to encourage plan participation. PAUL J. SCHNEIDER, BRIAN M. PINHEIRO, ERISA: A COMPREHENSIVE GUIDE §1.02 (3d ed. 2008). In addition to protecting plan participants, Congress also sought to protect plan beneficiaries. *See Boggs v. Boggs*, 520 U.S. 833, 845 (1997). In order to meet those ends Congress enacted an intricate, comprehensive statute that governs both pension and welfare plans. *Id.* at 841. ERISA pension plans must comply with participation, vesting, and funding requirements. *Id.* The statute also established "a straightforward rule of hewing to the directives of the plan documents," imposing on plan administrators a "bright-line requirement to follow plan documents in distributing benefits." *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, ___ U.S. ___, 129 S. Ct. 865, 875, 876 (2009).

More recently, Congress further refined the statutory framework with the Retirement Equity Act of 1984 ("REA"), Pub. L. No. 98-397, 98 Stat. 1426, which particularly sought to protect the rights of surviving spouses. These amendments modified and strengthened the expansive coverage for surviving spouses by providing economic security through "a stream of income to surviving spouses," even after the participant's death. *Boggs*, 520 U.S. at 843.

In order to protect surviving spouses in the event of the plan participant's death or divorce, ERISA provides for two

types of survivor annuity benefits. *See Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan*, 433 F.3d 1091, 1095 (9th Cir. 2006). If a vested participant dies before the annuity start date and the participant is survived by a spouse, the surviving spouse is entitled to a qualified preretirement survivor annuity ("QPSA"). 29 U.S.C. § 1055(a)(2). Because Lupe died after retirement, his annuity benefits were paid in the form of the second type, a qualified joint and survivor annuity or "QJSA." 29 U.S.C. § 1055(a)(1). QJSA benefits arise when the participant does not die before the annuity starting date. *Id.* These benefits are payable to the plan participant for his lifetime after the annuity start date and, if the plan participant dies before his spouse, the surviving spouse will receive no less than 50 percent of the amount of the annuity for the remainder of her lifetime. *See* 29 U.S.C. § 1055(d)(1)(A).

**[8]** "ERISA requires that every [QJSA] include an annuity payable to a nonparticipant surviving spouse." *Boggs*, 520 U.S. at 842. These QJSA benefits are particular to the surviving spouse and may not be waived by the participant alone. *Id.* In order for a participant's spouse to waive her interests in QJSA benefits, the spouse must consent in writing, and in the presence of a plan representative or notary public, during the applicable election period. *See* 29 U.S.C. § 1055(c). Under these provisions, Janis, as Lupe's surviving spouse at the time of his retirement, was entitled to his QJSA benefits after his death. She did not waive her interest in the surviving spouse benefits during the applicable election period or consent to have Judy designated as the beneficiary. *See Boggs*, 520 U.S. at 842. We must determine, then, whether other provisions of ERISA permit the Nevada family court to reassign the QJSA survivor benefits from Janis to Judy.

ERISA contains an antialienation provision and a preemption provision that restrict the ability of state courts and plan participants to transfer and alter interests in ERISA-governed retirement benefits. *See* 29 U.S.C. § 1056 (d)(1) ("Each pen-

sion plan shall provide that benefits provided under the plan may not be assigned or alienated."); 29 U.S.C. § 1144(a) (establishing that ERISA "supercede[s] any and all State laws insofar as they may . . . relate to any employee benefit plan . . . ."). Despite this broad preemption and antialienation scheme, Congress has recognized that states, in some circumstances, should be able to enforce their own domestic relations laws with respect to ERISA pensions. As a result, state domestic relations orders ("DROs") that comply with statutory requirements are exempt from both the antialienation and preemption provisions of ERISA. 29 U.S.C. § 1144(b)(7); 29 U.S.C. § 1056 (d)(3); *Hamilton*, 433 F.3d at 1096 n.5. A valid DRO can be any judgment, decree, or order which (1) "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependant of a participant," and (2) "is made pursuant to a State domestic relations law." 29 U.S.C. § 1056 (d)(3)(B)(ii). The qualified domestic relations order, or QDRO, "is a subset of domestic relations orders that recognizes the right of an alternate payee to receive all or a portion of the benefits payable with respect to a participant under the plan." *Hamilton*, 433 F.3d at 1096 (citing 29 U.S.C. § 1056 (d)(3)(B)(i)(I)) (internal quotation marks omitted).[6]

Although state courts, via DROs, may create enforceable interests in the proceeds of an ERISA plan, there are limitations on the ability of state courts to create enforceable prop-

---

[6]To be sure, a party can waive an entitlement to an interest without expressing that waiver in the form of a QDRO, as the Supreme Court recently held. Although the Fifth Circuit had held a waiver by a divorcing spouse expressed in a divorce decree ineffective under ERISA's antialienation provision because it was not expressed in a QDRO, the Court held that such a waiver of rights could be effective nonetheless. *Kennedy*, 129 S. Ct. at 870-74. That ability to alter the entitlement to benefits outside of a QDRO is limited to a waiver of rights, however. It does not permit an assignment of interest to anyone else or an identification of an alternate payee; that still requires a QDRO to be effective under ERISA. *Id.* at 873.

erty interests in alternate payees. *See Trs. of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 420 (9th Cir. 2000). First, in order for a DRO to be considered a QDRO, the state courts must fulfill certain specificity requirements. These requirements allow a plan administrator to more easily administer the plan and reduce the risk of making improper payments. *See Hamilton*, 433 F.3d at 1096-97 (citing *In re Gendreau*, 122 F.3d 815, 817-18 (9th Cir. 1997)). A DRO meets the requirements of a QDRO and thus is enforceable only if the order "clearly specifies" (1) the name and mailing address of both the participant and the alternate payees, (2) the amount or percentage of the participant's benefits to be paid to each alternate payee, (3) the number of payments to which the order applies, and (4) the plan to which the order applies. 29 U.S.C. § 1056 (d)(3)(C). If the state court fails to substantially comply with the statutory QDRO requirements, even a valid domestic relations order is not enforceable against a pension plan. *See Hamilton*, 433 F.3d at 1097.[7]

Second, the DRO itself must create an enforceable interest that is permitted under ERISA's statutory scheme. *See Hamilton*, 433 F.3d at 1097-99. Among other things, a DRO is valid under ERISA only if it recognizes the existence of an alternate payee's right to receive benefits "payable with respect to a participant under a plan." *Id.* at § 1056(d)(3)(B)(i)(I). Additionally, a DRO may not require a plan to provide any type or form of benefit, or any option not otherwise provided by the plan, or to provide increased benefits to an alternate payee. *Id.* at § 1056(d)(3)(D).

The two limitations work together. The first limitation concerns the form of the state court order: the state DRO may

---

[7]It was argued in this appeal that the relevant orders entered by the Nevada family court did not satisfy this specificity requirement, but we do not need to resolve that issue, given our conclusion that the Nevada court's DROs did not create interests enforceable under ERISA's scheme.

create an alternate payee's enforceable interest, but the alternate payee may not enforce that interest unless and until he or she has complied with the QDRO specificity provisions. *See Tise*, 234 F.3d at 421. The second limitation is substantive: certain alterations to the benefits provided by a plan governed by ERISA are forbidden. Thus, in certain respects, ERISA limits what a state family court can order. *See Hamilton*, 433 F.3d at 1098-1110.

Based on these limitations, IATSE argues that the family court's orders cannot be valid QDROs and thus cannot divest Janis of her interest in the QJSA's survivor benefits because the state court orders were issued after Lupe's retirement. According to IATSE, surviving spouse benefits pursuant to a QJSA irrevocably vest in the participant's spouse at the time of the participant's retirement and cannot be altered or assigned. Because Janis was Lupe's spouse at the time of his retirement, IATSE argues that her remainder interests vested at the time of his retirement and no QDRO can reassign the benefits. Judy argues in response that ERISA contains no provisions limiting when a state court can issue a DRO to transfer QJSA benefits from a surviving spouse to an alternate payee, and therefore so long as the state court fulfills the specificity requirements of a QDRO it may create an enforceable interest at any time, even after a participant's retirement.

**[9]** This case presents an issue of first impression in this Circuit: whether a "plan participant's retirement cuts off a putative alternate payee's right to obtain an enforceable QDRO" with regard to the surviving spouse benefits of a QJSA. *Tise*, 234 F.3d at 423 n.6. We are persuaded that IATSE's interpretation is correct and that the answer to this question is "Yes."

In *Hopkins v. AT&T Global Info. Solutions Co.*, 105 F.3d 153 (4th Cir. 1997), the Fourth Circuit addressed a set of circumstances similar to the one presented here. In *Hopkins*, the ERISA plan participant divorced his first wife, Vera, in 1986

and was ordered to pay her alimony. *Id.* at 154. In order to collect the alimony, Vera obtained a judgment allowing her to attach her ex-husband's wages. *Id.* After his divorce from Vera, the participant married his second wife, Sherry. There-after, in 1993, he retired. At that time Vera attempted to attach both his portion of the QJSA benefits and Sherry's surviving spouse benefits under the QJSA. *Id.*

The court closely examined 29 U.S.C. § 1056 and 29 U.S.C. § 1055, which regulate QDROs and QJSAs respec-tively, and concluded that surviving spouse benefits under a QJSA vest at the time of the participant's retirement. *Id.* at 155-156. In order to be "qualified," and thus enforceable, a DRO must create an alternate payee's right to benefits "pay-able with respect to a participant under a plan." *Id.*; 29 U.S.C. § 1056(d)(3)(B). According to *Hopkins*, if the surviving spouse benefits vested upon the participant's retirement, the DRO would relate to a benefit payable with respect to a bene-ficiary, not payable "with respect to a participant." *Id.* at 156. Thus, if the spouse's interest in the benefits vested upon the participant's retirement, the domestic relations order could not be qualified and could not be an exception to the preemption and antialienation provisions. *Id.*

[10] The court then analyzed 29 U.S.C. § 1055 and con-cluded that the participant spouse's QJSA surviving spouse rights "vest" upon the participant spouse's retirement.**[8]** *Id.* Various changes to ERISA created by the REA indicate that the participant's retirement or the start of the annuity estab-lishes a vesting point for the surviving spouse benefits. First, the REA changed the QJSA surviving spouse benefits so that benefits may be paid to a spouse who was married to a partici-pant at the participant's retirement, regardless of whether they were married at the participant's death. *Id.* Second, the REA

---

**[8]**The *Hopkins* court did not distinguish between the annuity start date and the participant's retirement date. Indeed, in *Hopkins*, like the case before us, the two dates are the same.

made it more difficult for a participant to replace a QJSA with another type of benefit. The participant could only change the benefit within ninety days prior to retirement and with the spouse's written consent.[9] *Id.* at 156-57. Unless the participant changes the form of benefit with his current spouse's written permission, the participant is locked into a QJSA at retirement. *Id.* at 157. Moreover, after the retirement date, the form of benefit cannot be changed even with the spouse's consent. *Id.* Based upon the language in ERISA, as well as the changes made under the REA, the Fourth Circuit concluded that the plan participant's retirement created a vested interest in the surviving spouse, and thus Vera's DRO could never be "qualified" for the purposes of a QDRO. *Id.*

Judy contends that we should not rely upon the Fourth Circuit's reasoning in *Hopkins* because another Ninth Circuit case compels an outcome in her favor here. In *Tise*, we addressed the question whether an otherwise valid QDRO assigning other ERISA benefits (i.e., not QJSA benefits) can issue after the death of the plan participant. 234 F.3d at 415. The plaintiff, the mother of the plan participant's children, obtained a child support judgment against the participant prior to his death. *Id.* at 417-19. The plan participant died before retirement (and after marrying the surviving spouse), but before Tise was able to establish that the state court order met the specificity requirements for a QDRO. *Id.* We held that a state court order obtained prior to a participant's death or retirement creates an enforceable interest in the participant's surviving spouse benefits even if the alternate payee is unable to qualify the DRO before the participant's death. *Id.* at 423.

We came to this conclusion by analyzing the complex ERISA framework and meticulously considering the provisions of the statute that contemplate a situation in which a valid QDRO does not issue until after benefits become pay-

---

[9] Now, the applicable time period for an election of benefits is 180 days prior to retirement. *See* § 1055(c)(7)(A).

able. We concluded that ERISA "specifically provides for situations in which no valid QDRO issues until after benefits become payable. Once the pension plan is on notice that a domestic relations order has issued that *may* be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO . . . ." *Id.* at 421. Furthermore, ERISA provides for further state court proceedings after the initial DRO is issued to clarify and fix any technical defects in the original DRO. *Id.* at 422 (citing 29 U.S.C. § 1056(d)(3)). Therefore, we have held that so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death. *Id.* at 423.

In holding that an alternate payee may obtain a valid QDRO even after a plan participant's death, we rejected the first part of *Hopkins*'s logic, that once a spouse's rights to an annuity have vested a DRO cannot become a QDRO because the order can no longer be "payable with respect to a participant under a plan." *Id.* at 423-24. We concluded that "payable with respect to a participant" includes benefits payable *to* a participant as well as benefits payable to any beneficiaries that may be eligible to receive such benefit. *See id.* at 423, 423 n.7. Therefore, section 1056(d)(3)(B)(I) does not, in and of itself, prohibit the assignment of surviving spouse benefits to an alternate payee, even after a plan participant has retired.

**[11]** While we recognize that *Tise* expressly, and we believe rightly, rejected part of the Fourth Circuit's reasoning in *Hopkins*, we are nonetheless persuaded by the structure and purpose of ERISA that the rule enunciated in *Hopkins* is the proper rule for QJSA benefits. Indeed, we expressly left open this possibility. *See id.* at 423 n.6, 423 n.7 ("Whether a QDRO issued after a plan participant's retirement may affect the distribution of surviving spouse benefits pursuant to 29 U.S.C. § 1055 implicates statutory provisions and policy considerations other than those here applicable.").

First, ERISA's statutory scheme for QJSA benefits establishes the importance of the annuity start date, which is often the participant's retirement date, on the benefits at issue. The plan providers must provide participants and their spouses with a QJSA. §1055(a)(1). Under section 1055(c), QJSA benefits are automatically provided to employees in all ERISA-governed plans. The only way for the participant to opt out of the QJSA is for the participant *and* his spouse together to waive the QJSA benefit plan in writing. *See* 29 U.S.C. § 1055(c)(1)-(2). Both spouses, if they are going to decline QJSA benefits, may only do so during the applicable election period which is defined as "the 180-day period ending on the annuity starting date."[10] *Id.* at § 1055(c)(2), (7). Thus, the annuity starting date, which in this case is Lupe's retirement date, is the point at which the surviving spouse benefits vest in the participant's spouse.[11]

**[12]** We are also persuaded, as was the Fourth Circuit in *Hopkins*, that a number of changes in ERISA, effectuated by the REA, established the importance of the participant's date

---

[10]This statutory construction makes it difficult to adopt the alternative rule that Judy urges. It is difficult to see how courts may reassign QJSA surviving spouse benefits at any time given the fact that the statutory scheme so diligently and strictly protects the interests of the participant's spouse at the time of the participant's retirement by establishing that the only way to avoid QJSA survivor benefits is by opting out in writing *before the retirement date*.

[11]The terms of the IATSE plan itself also suggest that the surviving spouse's interest vests at the time of Lupe's retirement. The plan informed Lupe that he would automatically be paid in the form of a QJSA if he was married at least 12 months prior to the benefit starting date (his retirement) unless he chose otherwise. It also established that the exact amount of monthly benefits payable to him and his spouse under the QJSA depended upon "the relative ages of you and your spouse at the *time of your retirement*" (emphasis added). Thus the plan established both that the type of plan and the amount of benefits were calculated at the time of retirement and the amount was calculated based on the relative ages of him and his spouse. This structure suggests that the benefits vested at retirement in the surviving spouse.

of retirement as the moment at which the surviving spouse benefits vest. The fact that the REA established that surviving spouse benefits may now be paid to a spouse who is married on the day of the participant's retirement, regardless of whether the participant and spouse are married at the participant's death, suggests that the retirement date is the crucial date for establishing the rights of the surviving spouse. *Hopkins*, 105 F.3d at 156. Following this reasoning, we conclude that once a participant retires, the spouse at the time becomes the "surviving spouse" entitled to the QJSA benefits.

In addition to finding support for the *Hopkins* rule from the statutory scheme, we are also persuaded that the ultimate objectives of Congress are served by recognizing the rule that a QDRO may not reassign surviving spouse benefits after a plan participant has retired. *See Hamilton*, 433 F.3d at 1099 (noting that congressional intent ultimately determines whether or not a particular statutory interpretation applies to surviving spouse benefits); *Boggs*, 520 U.S. at 843 (considering congressional intent when analyzing qualified joint and survivor annuity benefits).

ERISA's surviving spouse benefits established in section 1055 were created in part "to ensure a stream of income to surviving spouses." *Boggs*, 520 U.S. at 843. Specifically, Congress was concerned with providing for spouses that were not able to accrue their own set of retirement benefits independent from their working spouses. Prior to ERISA there was no requirement that retirement plans provide for an employee's spouse in the event that the employee predeceased a spouse not working outside the home ("non-working spouse"). Congress concluded that such a regime "[could] result in a hardship where an individual primarily dependent on his pension as a source of retirement income is unable to make adequate provision for his spouse's retirement years should he predecease her." H.R. Rep. No. 93-807, at 4732 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4732. Likewise, in amending ERISA through the REA, Congress

adopted changes to the statutory scheme to take into account "changes in work patterns, the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home." Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 (codified as amended in scattered sections of 29 U.S.C.). Congress created surviving spouse benefits, like those found in QJSAs, to protect non-participant spouses, particularly those that may not work outside the home and thus may not have independent retirement benefits.

The *Hopkins* rule applied in this case may not clearly protect a non-working spouse whose interest in the surviving spouse benefits may have accrued over time, since Lupe was not married to either Janis or Judy during most of his working years when he earned the pension benefits. Nonetheless, such a rule would protect a non-working spouse in many situations involving a post-retirement attempt to transfer surviving spouse benefits. The finely tuned congressional scheme would not be served by state court DROs that attempt to divest a non-working spouse's interest in her surviving spouse benefits. Similarly, congressional intent is not advanced by permitting a subsequent post-retirement spouse to collect benefits accrued during an economic partnership she or he was not a part of.[12]

---

[12]We note that this view is advanced by the legislative history of the REA. The Senate Report notes that in theory "a qualified domestic relations order could provide that the former spouse is not entitled to any survivor benefits under the plan." S. Rep. No. 98-575, at 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2562. While we recognize that this passing note contradicts our conclusion that Janis's surviving spouse benefits vested at Lupe's retirement, we are nonetheless convinced that the structure of the statute, the purposes and policies undergirding ERISA, and the authority from other jurisdictions following this interpretation support our conclusion. Furthermore the note does not contradict the outcome here because Lupe did not seek to divest Janis of her surviving spouse rights, but rather attempted to replace her with Judy, something that neither the statutory language nor the legislative history permits.

Additionally, a vesting rule also promotes one of the principal goals underlying ERISA: "ensuring that plans be uniform in their interpretation and simple in their application." *McGowan v. NJR Serv. Corp.*, 423 F.3d 241, 246 (3d Cir. 2005) (internal quotation marks and citations omitted), *abrogated on other grounds by Kennedy*, 129 S. Ct. 865. While administrative convenience is not entirely determinative of what is required of pension plans under ERISA, we are convinced that it should be a consideration when deciding whether the statutory scheme requires pension plans to act in a certain way.

Both the participant's post-retirement pension benefits and surviving spouse benefits under the QJSA are calculated based upon the life of the two spouses at the time the benefits become payable. The benefits payable to each are computed based upon the "actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(A)-(B) (establishing that the participant receives pension benefits "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of . . . the amount of the annuity which is payable during the joint lives of the participant and the spouse"). The calculation and payment of the pension benefits mean that it is important for the plan administrators to know, with some finality, who the spouse is at the time that the benefits become payable:

> Because the disbursement of plan benefits is based on actuarial computations, the plan administrator must know the life expectancy of the person receiving the Surviving Spouse Benefits to determine the participant's monthly Pension Benefits. As a result, the plan administrator needs to know, on the day the participant retires, to whom the Surviving Spouse Benefit is payable.

*Hopkins*, 105 F.3d at 157 n.7. Allowing participants to change surviving spouse beneficiaries after the participant has retired

and already begun receiving benefit payments would make it difficult for trustees to administer plans based on the actuarial value of both the participant and the surviving spouse. We therefore agree with *Hopkins*, as well as with other courts that have either implicitly or explicitly concluded that the surviving spouse benefits irrevocably vest in the current spouse when the plan participant retires. *See Hopkins*, 105 F.3d at 157; *see also Rivers v. Central and South West Corp.*, 186 F.3d 681 (5th Cir. 1999); *Walsh v. Woods*, 638 S.E.2d 85 (S.C. Ct. App. 2006); *Hamilton*, 433 F.3d at 1096 (noting that problems in QDROs often go undetected "until the participant dies or retires, that is, when the survivor benefits irrevocably vest in the current spouse and it is too late to do anything about it") (quotation omitted); *Anderson v. Marshall*, 856 F. Supp. 604, 607 (D. Kan. 1994); *cf. Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir. 1990) (en banc) (allowing the waiver of surviving spouse benefits as required in a divorce decree entered prior to the participant's retirement); *but see Torres v. Torres*, 60 P.3d 798 (Haw. 2003).

**[13]** Because the retirement of a plan participant ordinarily creates a vested interest in the surviving spouse at the time of the participant's retirement, we conclude that a DRO issued after the participant's retirement may not alter or assign the surviving spouse's interest to a subsequent spouse. The Nevada family court's attempted transfer of interests in Janis's surviving spouse benefits to Judy is prohibited.

It is important to note that this opinion does not disturb our prior holding in *Tise*. Fundamentally, *Tise* answers a very different question from the one presented here. In *Tise*, we determined when a DRO, which creates an enforceable interest in an alternate payee, can be "qualified" for QPSA benefits. *Tise* established that a state court domestic relations order may be qualified even after a participant's death, "[b]ecause a QDRO only renders enforceable an already-existing interest." 234 F.3d at 421. In contrast, here we ask whether there are any

restrictions as to when a state can create an enforceable inter-
est in an alternate payee for QJSA surviving spouse benefits.
We hold here only that a state DRO may not create an
enforceable interest in surviving spouse benefits to an alter-
nate payee after a participant's retirement, because ordinarily
at retirement the surviving spouse's interest irrevocably vests.[13]

Additionally, ERISA only permits state court DROs to
reassign surviving spouse benefits if they meet the require-
ments of 29 U.S.C. § 1056(d)(3)(F). *Hamilton*, 433 F.3d at
1099. Section 1056(d)(3)(F) governs the use of QDROs to
reassign benefits pursuant to 29 U.S.C. § 1055 and states that
"to the extent provided in any qualified domestic relations
order the former spouse of a participant shall be treated as a
surviving spouse of such participant . . . ." We have inter-
preted this provision as permitting a transfer of surviving
spouse benefits established under section 1055 only if the
QDRO expressly assigns surviving spouse rights to a former
spouse. *See Hamilton*, 433 F.3d at 1099. Here, Judy is not a
"former spouse" but rather is a "future" or "subsequent
spouse" because she married Lupe after his retirement. *See
Hopkins*, 105 F.3d at 157 n.6. No part of ERISA contemplates
reassignment of surviving spouse benefits to a future or sub-
sequent spouse. We take Congress's silence with respect to
the rights of a future or subsequent spouse to obtain control
of surviving spouse benefits as "powerful support for the con-
clusion that the right does not exist." *Boggs*, 520 U.S. at 847-
48.

Judy also argues that Janis waived her right to the surviving
spouse benefits by the property settlement when the state

---

[13]We say "ordinarily" because we recognize that there may be other sit-
uations, not present in this case, in which a contrary result may be appro-
priate. For example, it is possible that a former spouse could obtain a DRO
prior to the annuity start date and present it to the plan, but the actual
determination of whether the DRO is a QDRO might not be finalized prior
to the date on which the benefit would normally become payable. *See,
e.g.*, 29 U.S.C. § 1056(d)(3)(H).

court entered its divorce decree. As the Supreme Court made clear in *Kennedy*, ERISA's antialienation provision does not prohibit a surviving spouse beneficiary from waiving his or her interest in plan benefits, but such a waiver must also conform to plan procedures and instruments. Indeed, the Court concluded that the plan administrator in that case was not, under the terms of the plan, required to honor the waiver of benefits contained in the divorce decree and that the continued payment of benefits to the prior spouse was proper. *See Kennedy*, 129 S. Ct. at 874-78. Under the so-called "plan documents rule," plan administrators must "hew[ ] to the directives of the plan documents" rather than "examin[ing] a multitude of external documents that might purport to affect the dispensation of benefits" and becoming "drawn into litigation like this over the meaning and enforceability of purported waivers." *Id.* at 876, 877 (internal quotation marks omitted).

Both the IATSE plan documents and ERISA's statutory scheme allow for the waiver of surviving spouse benefits with both spouses' written consent during the benefits election period prior to the participant's retirement. 29 U.S.C. § 1055(c)(3). That procedure was not followed here. Judy has identified nothing in the IATSE plan documents which require the plan administrator to redirect surviving spouse benefits to Judy, who was not, at the time of retirement and vesting, either a present or former spouse. Even if it is assumed that Janis had the authority to disclaim benefits, there is nothing that provides for them to be assigned instead to Judy.

## C. The Constructive Trust

IATSE also contends that it was impermissible for the state court to create a constructive trust on the annuity proceeds. We agree that a state law constructive trust cannot be used to contravene the dictates of ERISA.

ERISA preemption supercedes "any and all state laws insofar as they may now or hereafter relate to any employee bene-

fit plan" covered by ERISA. 29 U.S.C. § 1144(a). The Supreme Court has observed that the preemption provision is "clearly expansive" but that it cannot be taken "to extend to the furthest stretch of its indeterminacy." *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001) (citations and internal quotation marks omitted). A state law "relates to an ERISA plan if it has a connection with or reference to such a plan." *Id.* at 147 (citations and internal quotation marks omitted). To determine whether a state law is preempted because it relates to an ERISA plan, the courts look to the nature and effect of the state law on ERISA plans as well as the objectives of the ERISA statute. *Id.*

In *Melton v. Melton*, the Seventh Circuit observed that "*Egelhoff* stands for the proposition that a state law cannot invalidate an ERISA plan beneficiary designation by mandating distribution to another person." 324 F.3d 941, 945 (7th Cir. 2003) (citations omitted). The court applied that proposition to conclude that ERISA preempted a state court law that permitted the imposition of a constructive trust on ERISA proceeds. It concluded that the imposition of a constructive trust to subvert ERISA-mandated beneficiaries was directly controlled by *Egelhoff* and preempted by ERISA. *Id.* Thus the court held that state law doctrines (including constructive trusts) may not be invoked to assign benefits to parties other than those designated as beneficiaries under ERISA. *Id.*

Furthermore, as the Supreme Court concluded in *Boggs*, ERISA can preempt state law even after benefits have been disbursed to beneficiaries. 520 U.S. at 842 (rejecting the argument that state law can apply when it affects "only the disposition of plan proceeds after they have been disbursed by [the plan] and thus nothing is required of the plan"). Therefore a state court cannot achieve through a constructive trust on the proceeds of a pension plan what this court maintains it cannot achieve through a QDRO. Any alternative rule would allow for an end-run around ERISA's rules and Congress's policy objective of providing for certain beneficiaries, thereby

greatly weakening, if not entirely abrogating, ERISA's broad preemption provision.

Judy relies upon our decision in *Emard v. Hughes Aircraft Co.*, 153 F.3d 949 (9th Cir. 1998), for the proposition that once a plan distributes proceeds to the proper ERISA beneficiary, a state law created constructive trust is too attenuated to fall within the mandatory preemption provision. *Id.* at 954. *Emard,* however, was abrogated by *Egelhoff*, 532 U.S. 141, and thus *Emard*'s holding, to the extent it can be interpreted as an end-run around ERISA's mandates, no longer survives.[14]

[14] In this case, the constructive trust that the state court created was explicitly an attempt to avoid ERISA's QDRO, preemption, and antialienation provisions. We conclude that Congress did not intend to permit the reassignment of surviving spouse benefits and, therefore the constructive trust remedy that the state court tried to impose is also preempted by ERISA. It may not be that all constructive trusts instituted by state courts, particularly those that seek to recover ill-gotten gains, will have a sufficient connection with or reference to an ERISA plan to trigger ERISA's preemption provision.[15]

---

[14]Additionally, *Emard* addressed insurance benefits and not pension plan benefits. *Emard*, 153 F.3d at 953. As noted in *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365 (1990), ERISA's antialienation provision applies only to pension benefits and not welfare benefits. Thus an independent reason (the antialienation provision) prohibits the use of constructive trusts to garnish pension benefits in this case. *See id.* at 371-72. In *Guidry*, the Supreme Court concluded that a constructive trust could not be used to disgorge a pension plan fiduciary's ill-gotten gains because it was prohibited by the antialienation provision of ERISA and did not meet any of the statutory exceptions to the ERISA provision. *See id.* at 372-376. On remand, the Tenth Circuit upheld the imposition of a constructive trust and concluded that ERISA did not prohibit post-payment garnishment of ill-gotten gains. *See Guidry v. Sheet Metal Workers Nat'l. Pension Fund*, 39 F.3d 1078 (10th Cir. 1994) (en banc). This decision, too, preceded both *Egelhoff* and *Boggs*, and may not survive.

[15]In *Kennedy*, the Court explicitly declined to express a view on whether an action could have been brought to obtain benefits from the former spouse after they had been distributed to her. 129 S. Ct. at 875 n.10.

But when a state court creates a constructive trust with the explicit purpose of avoiding ERISA's rules, it too must be preempted.

Congress, through ERISA, has created a set of fixed property rules state courts are bound to work within. State family courts can and should distribute property in an equitable manner upon divorce, but they must take into account ERISA's rules. ERISA prohibits the state family court from steering the surviving spouse benefits from Janis to Judy, but ERISA did not prohibit the state court from dividing other property or making other adjustments mindful of the benefits provided under the ERISA plan. In this instance, the state family court provided for a transfer of $1500 from Lupe to Janis based upon the premise that Lupe and Janis would each retain their pension benefits as separate property. That premise may have been faulty, but that does not justify disregarding the ERISA limitations.

## III.   Conclusion

We conclude that Janis's lawsuit against both Hilton and Judy was properly dismissed by the district court for lack of subject matter jurisdiction. Although Janis may have been right on the underlying substantive issue, she already had her day in court on the question and, under the circumstances, is barred under the *Rooker-Feldman* doctrine from seeking recourse in federal court at this time.

IATSE's similar argument is not barred, however. We agree with its contention that it is not required to make payment of the surviving spouse benefits to Judy or to the constructive trust ordered by the Nevada family court. Under ERISA, Janis's interest in the surviving spouse benefits vested at Lupe's retirement and federal law preempted the state court orders directing the plans to change the beneficiaries and creating a constructive trust.

We remand the matter to the district court for whatever further proceedings may be necessary and appropriate. Each party is to bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**